No.26-2581

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

AMERICANS FOR CITIZEN VOTING PAC,
PLAINTIFF-APPELLEE,
*v.*
MEAGAN WOLFE, *et al.*,
DEFENDANTS-APPELLEES,

APPEAL OF: WISCONSIN STATE LEGISLATURE,
PROPOSED INTERVENOR

On Appeal From The United States District Court
For The Eastern District of Wisconsin
Case No.2:26-cv-786
The Honorable Lynn Adelman, District Judge

**APPENDIX TO THE WISCONSIN STATE LEGISLATURE'S PRINCIPAL BRIEF**

CARSON A. COX
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1338
carson.cox@troutman.com

ALEXANDER J. HILL
TROUTMAN PEPPER LOCKE LLP
600 Peachtree St. NE #3000
Atlanta, GA 30308
(404) 885-2763
alex.hill@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
TROUTMAN PEPPER LOCKE LLP
225 W. Randolph St., Suite 2600
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Counsel for Proposed Intervenor*
*Wisconsin State Legislature*

## TABLE OF CONTENTS


1. Notice of Removal With Complaint, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.1 (E.D. Wis. May 4, 2026) .......................................................... App.1–13

2. Memorandum In Support Of Plaintiff's Motion For A Temporary Restraining Order And Preliminary Injunction, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.6 (E.D. Wis. May 4, 2026) ......................... App.14–36

3. Defendants' Brief In Opposition To Motion For Temporary Restraining Order Or Preliminary Injunction, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.14 (E.D. Wis. May 8, 2026) ................................................ App.37–69

4. Order Denying Plaintiff's Motion For A Temporary Restraining Order And Setting Scheduling Conference, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.17 (E.D. Wis. May 12, 2026)...................... App.70–76

5. The Wisconsin State Legislature's Memorandum Of Law In Support Of Motion To Intervene, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.20 (E.D. Wis. May 13, 2026) ............................................ App.77–102

6. Minute Entry, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.22 (E.D. Wis. May 15, 2026) ................App.103

7. Plaintiff's Response To The Wisconsin State Legislature's Motion To Intervene, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.24 (E.D. Wis. June 4, 2026)...................................................... App.104–07

8. Defendants' Brief In Opposition To Legislature's Motion To Intervene, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.25 (E.D. Wis. June 4, 2026)...................... App.108–32

9. The Wisconsin State Legislature's Reply In Support Of Motion To Intervene, *Ams. For Citizen Voting PAC v. Wolfe, et al.*, No.2:26-cv-786, R.27 (E.D. Wis. June 11, 2026)......... App.133–50

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

v. Case No. 26-CV-0786

MEAGAN WOLFE, in her official capacity as Administrator of the Wisconsin Elections Commission, ANN S. JACOBS, MARK L. THOMSEN, CARRIE RIEPL, DON M. MILLIS, MARGE BOSTELMANN, and ROBERT F. SPINDELL, JR., in their official capacities as Commissioners of the Wisconsin Elections Commission,

Defendants.

---

## NOTICE OF REMOVAL

---

Defendants Meagan Wolfe, Ann S. Jacobs, Mark L. Thomsen, Carrie Riepl, Don M. Millis, Marge Bostelmann, and Robert F. Spindell, Jr., hereby remove the above-captioned action from Waukesha County Circuit Court, Case No. 26-CV-0781, to the United States District Court for the Eastern District of Wisconsin, Milwaukee Division, pursuant to 28 U.S.C. §§ 1441(a) and 1446. The grounds supporting removal are as follows:

1. A civil action was commenced and is now pending in the circuit court for Waukesha County, Wisconsin: *Americans for Citizen Voting PAC v. Meagan Wolfe, et al.*, Case No. 26-CV-0781. This action was brought by the

plaintiff, Americans for Citizen Voting PAC, against the defendants, Meagan Wolfe, in her official capacity as Administrator of the Wisconsin Elections Commission, and Ann S. Jacobs, Mark L. Thomsen, Carrie Riepel, Don M. Millis, Marge Bostelmann, Robert F. Spindell, Jr., in their official capacities as Commissioners of the Wisconsin Elections Commission.

2. A copy of the summons and complaint were served on the defendants on April 29, 2026. Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon the defendants are attached and marked as Exhibit A.

3. This action contains a claim arising under the First and Fourteenth Amendments to the United States Constitution. The plaintiff raises facial challenges to the statutory provisions enacted in 2025 Wis. Act 126, which require a circulator of nomination papers and recall petitions to be a "qualified elector of this state" except for presidential and vice-presidential nomination papers. (Ex. A:11–18.) The plaintiff argues that 2025 Wis. Act 126's provisions violate the First Amendment, applied to the State of Wisconsin through the Fourteenth Amendment. (Ex. A:16–17.)

4. The United States District Court for the Eastern District of Wisconsin has original jurisdiction pursuant to 28 U.S.C. § 1331 over the plaintiff's federal constitutional claim. The defendants have removed the action to this district, as the action here was commenced in a Wisconsin circuit court (Waukesha County Circuit Court) within this district. 28 U.S.C. § 1441(a).

5. This action is being timely removed on May 4, 2026, within 30 days after service on the defendants. *See* 28 U.S.C. § 1446(b)(2)(B); Fed. R. Civ. P. 6(a).

6. Pursuant to 28 U.S.C. § 1441(a), removal of this claim is mandatory upon compliance with 28 U.S.C. § 1446, as herein accomplished.

7. Written notice of the removal of this action, including a copy of this notice of removal, is being electronically transmitted to the plaintiff and filed with the clerk of courts for the circuit court for Waukesha County, Wisconsin, as required under 28 U.S.C. § 1446(d).

WHEREFORE, the defendants represent that they have complied with the applicable provisions of law, and hereby give notice that this action stands

removed from the circuit court for Waukesha County, State of Wisconsin, to the United States District Court for the Eastern District of Wisconsin.

Dated this 4th day of May 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Hannah S. Jurss
HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8101
(608) 294-2907 (Fax)
hannah.jurss@wisdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on May 4, 2026, I electronically filed the foregoing Notice of Removal with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 4th day of May 2026.

Electronically signed by:

s/ Hannah S. Jurss
HANNAH S. JURSS
Assistant Attorney General

FILED
04-29-2026
Clerk of Circuit Court
Waukesha County
2026CV000781

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

AMERICANS FOR CITIZEN VOTING PAC
11166 Fairfax Boulevard
Suite 500, #1023
Fairfax, VA 22030

Plaintiff,

v.

MEAGAN WOLFE, in her official capacity as Administrator of the Wisconsin Elections Commission, and ANN S. JACOBS, MARK L. THOMSEN, CARRIE RIEPL, DON M. MILLIS, ROBERT F. SPINDELL, JR., and MARGE BOSTELMANN, in their official capacities as Commissioners of the Wisconsin Elections Commission,
201 West Washington Avenue, 2nd Floor
Madison, Wisconsin 53703

Defendants.

Case Type: Declaratory Judgment
Case Code: 30701
Case No. 26-CV-

## COMPLAINT

Plaintiff Americans for Citizen Voting PAC ("ACV PAC"), by and through undersigned counsel, complains against Defendants Meagan Wolfe, Ann S. Jacobs, Mark L. Thomsen, Carrie Riepl, Don M. Millis, Robert F. Spindell, Jr., and Marge Bostelmann as follows:

## INTRODUCTION

1. This is a civil rights action challenging various provisions of Wisconsin law as amended by 2025 Wisconsin Act 126 ("Act 126")[1], which unlawfully restrict core political speech and associational rights protected by the First Amendment.

2. Act 126 amends Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3), 8.40(2), and 9.10(2)(em)2. in order to impose strict residency requirements upon individuals who circulate nomination papers or recall petitions in the State of Wisconsin.

3. Specifically, Act 126 amends state law to require circulators to be "qualified elector[s]" of Wisconsin, and any nomination papers or recall petitions circulated by a non-qualified elector are invalid.

4. Those residency requirements violate the First Amendment. *See Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), which struck down an Illinois law imposing similar residency requirements on circulators as a substantial burden on core political speech.

5. This is not the first time Wisconsin has tried to restrict out-of-state circulators. A previous Wisconsin law imposing similar residency requirements for circulators was struck down more than twenty years ago. *See Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003).

6. Nevertheless, Act 126 was signed into law by Governor Tony Evers on March 27, 2026.

---

[1] Available at https://docs.legis.wisconsin.gov/2025/related/acts/126.

7. Time is of the essence, as nomination papers are being circulated right now for the fall election. Plaintiff is seeking immediate temporary relief.

**PARTIES**

8. Plaintiff Americans for Citizen Voting PAC ("ACV PAC") is a federal political action committee registered with the Federal Election Commission as a Hybrid PAC since December 27, 2023.

9. ACV PAC maintains its principal place of business in Fairfax, Virginia.

10. ACV PAC does not accept corporate contributions into its contribution account and is eligible to support candidates for state and federal office in the State of Wisconsin.

11. ACV PAC was formed to promote election integrity, to support policies that ensure only United States citizens vote in American elections, and to support candidates and efforts to advance those goals across the country.

12. As part of advancing its mission and goals, ACV PAC seeks to support and associate with candidates for public office in the State of Wisconsin.

13. One way that ACV PAC wants to support and associate with candidates for public office in the State of Wisconsin is by helping those candidates collect signatures on nomination forms.

14. ACV PAC wants to work with out-of-state residents seeking to collect nomination signatures in Wisconsin but is prohibited from doing so by the residency requirements imposed by Act 126 and challenged in this action.

15. Defendant Meagan Wolfe is the Administrator of the Wisconsin Elections Commission and is sued in her official capacity.

16. Defendants Ann S. Jacobs, Mark L. Thomsen, Carrie Riepl, Don M. Millis, Robert F. Spindell, Jr., and Marge Bostelmann, are each sued in their official capacities as Commissioners of the Wisconsin Elections Commission, as they are collectively and individually are responsible for coordinating Wisconsin's responsibilities under state law regarding the laws challenged in this action.

**JURISDICTION AND VENUE**

17. This is an action for declaratory and injunctive relief for which this Court has jurisdiction under Wis. Stat. §§ 806.04 and 813.01.

18. Venue is proper in this Court is pursuant to Wis. Stat § 801.50(3)(a) because the sole Defendant is a state employee in an official capacity.

**BACKGROUND**

19. Petition circulation is core political speech.

20. Before Act 126, Wisconsin law permitted non-residents who would otherwise be eligible Wisconsin electors if they were Wisconsin residents, to circulate nomination papers and recall petitions provided they complied with state law, including certification requirements. *Compare* 2025 Wisconsin Act 126 *with* 2005 Wisconsin Act 451[2].

21. Act 126, which was signed into law on March 27, 2026, and published a day later, makes several changes to state law.

[2] Available at https://docs.legis.wisconsin.gov/2005/related/acts/451.

22. Act 126 amends Wis. Stat. § 8.15(4)(a) and related provisions to require that circulators state they are "a qualified elector of this state" with a narrow carve-out only for presidential/vice-presidential nomination papers.

23. Act 126 also requires that a circulator of a recall petition must certify they are "a qualified elector of this state."

24. Wis. Stat. § 6.02 sets the qualifications to be an elector in Wisconsin as being a U.S. citizen, age 18 or older, and having resided in Wisconsin for at least 28 days before any election.

25. This is not Wisconsin's first attempt at imposing residency requirements on circulators.

26. More than two decades ago, Wisconsin law required that circulators "reside[] within the district which the candidate . . . will represent." Wis. Stat. § 8.15(4)(a) (2001).[3] That requirement was challenged in federal court, deemed unconstitutional, and enjoined. *See Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003).

27. Following *Frami*, Wisconsin removed this requirement from the statutes via 2005 Wisconsin Act 451. The requirement remained out of Wisconsin law until Act 126 reinserted it.

28. After Act 126 was enacted, the Wisconsin Elections Commission updated its "Nomination Paper for Partisan Office" template to add "I am a qualified

[3] Available at https://docs.legis.wisconsin.gov/2001/statutes/statutes/8/15

elector of Wisconsin" to the "Certification of Circulator." **A true and correct copy of that template is attached hereto as Exhibit 1.**[4]

29. After Act 126 was enacted, the Wisconsin Elections Commission also sent a "communication" to "Wisconsin Candidates and Political Parties" explaining that, under Act 126, "Any person who is circulating nomination papers for the 2026 Fall Election cycle must reside in Wisconsin and must be qualified to vote in Wisconsin." **A true and correct copy of that memorandum is attached hereto as Exhibit 2.**[5]

30. Nomination papers for the November 2026 general election began to be circulated on April 15, 2026.

31. On that day, the Wisconsin Elections Commission posted on its X.com social media account (@WI_Elections): "It's go time! Candidates can begin circulating nomination papers today for the Aug. 11 election! FYI: Under a new law, circulators must live in WI & be qualified to vote in the state." **A true and correct copy of that post (as displayed on X.com) is attached hereto as Exhibit 3.**[6]

---

[4] This document is also available online at https://elections.wi.gov/sites/default/files/documents/EL-168%20Nomination%20Paper%20for%20Partisan%20Office_Fillable%20%28Rev.%202026-04%29_5.pdf.

[5] This document is also available on the Wisconsin Elections Commission's website at https://elections.wi.gov/candidates/getting-ballot (*See* "2026 Wisconsin Act 126 – Communication to Candidates & Political Parties.pdf").

[6] The post is also available on X.com at https://x.com/WI_Elections/status/2044461839954727038, and is archived at https://archive.ph/XwQGT.

32. Act 126 directly restricts the First Amendment protected activities of the Plaintiff.

33. Because of Act 126, Plaintiff is unable to work with out-of-state circulators to support and associate with candidates in the State of Wisconsin.

34. These restrictions shrink the pool of available circulators for Wisconsin candidates, prevent candidates from associating with out-of-state supporters, and thus limit the dissemination of political messages.

35. For Plaintiff, this means a limited pool of circulators with which it can associate to advance its goals and support candidates in furtherance of its mission.

36. Act 126 severely burdens Plaintiff's First Amendment rights because Plaintiff wants to engage out-of-state circulators to help Wisconsin candidates that it supports gather nomination signatures—but is prohibited from doing so in Wisconsin because of Act 126.

## CAUSES OF ACTION

### CLAIM ONE: VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS, 42 U.S.C. § 1983

37. Plaintiff realleges and incorporates the preceding allegations of the complaint.

38. The residency requirements imposed by Act 126 on petition circulators, as provided by Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3), 8.40(2), and 9.10(2)(em)2., substantially burden and infringe on Plaintiff's right to free speech and political association protected by the First Amendment, and applied to the State of Wisconsin through the Fourteenth Amendment.

39. These restrictions are not narrowly tailored to serve any compelling governmental interest.

40. In *Frami*, the United States District Court for the Western District of Wisconsin struck down Wisconsin's previous residency requirements for circulators.

41. The Seventh Circuit's *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) decision is controlling here. Under *Krislov*, the challenged residency requirements violate the First Amendment.

42. Defendants, acting under color of state law, have enforced and will continue to enforce these unconstitutional provisions, harming Plaintiff's rights guaranteed by the First Amendment unless this Court declares those provisions to be unconstitutional and enjoins future enforcement, all in violation of 42 U.S.C. § 1983.

43. "State courts have jurisdiction over actions brought under 42 U.S.C. § 1983." *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 19, 235 Wis. 2d 610, 612 N.W.2d 59 (citation omitted).

**REQUEST FOR RELIEF**

Plaintiff therefore requests the following relief:

A. Declare that the residency requirements imposed by Act 126, and contained in Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3), 8.40(2), and 9.10(2)(em)2., are unconstitutional under the First Amendment as applied to the State of Wisconsin via the Fourteenth Amendment;

B. Issue preliminary and permanent injunctive relief enjoining Defendants, their agents, employees, and successors from enforcing the residency requirements imposed by Act 126, and contained in Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3), 8.40(2), and 9.10(2)(em)2.

C. Award Plaintiff its attorney fees under 42 U.S.C. § 1988, costs, and any such other relief as the Court deems appropriate.

Dated: April 29, 2026.

Respectfully Submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

*Electronically signed by Nathalie E. Burmeister*

Lucas T. Vebber (#1067543)
Daniel P. Lennington (#1088694)
Nathalie E. Burmeister (#1126820)

1241 N. Franklin Place
Milwaukee, WI 53202
Phone: (414) 727-9455

lucas@will-law.org
dan@will-law.org
nathalie@will-law.org

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

Case No. 2:26-cv-786

v.

MEAGAN WOLFE, ANN S. JACOBS, MARK L. THOMSEN, CARRIE RIEPL, DON M. MILLIS, ROBERT F. SPINDELL, JR., and MARGE BOSTELMANN,

Defendants.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Lucas T. Vebber (#1067543)
Daniel P. Lennington (#1088694)
Nathalie E. Burmeister (#1126820)

1241 N. Franklin Place
Milwaukee, WI 53202
Phone: (414) 727-9455

lucas@will-law.org
dan@will-law.org
nathalie@will-law.org

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 2

A. Ballot access in Wisconsin ..... 2

B. The original Wisconsin residency requirements ..... 4

C. Wisconsin's latest attempt ..... 5

D. Plaintiff ..... 6

STATEMENT OF FACTS ..... 7

LEGAL STANDARD ..... 11

ARGUMENT ..... 12

I. Plaintiff is likely to succeed on the merits. ..... 12

II. Plaintiff will suffer irreparable harm if preliminary relief is denied and has no other adequate remedy at law. ..... 16

III. A balance of the harms and the public interest favors granting preliminary relief. ..... 18

RELIEF SOUGHT ..... 19

CONCLUSION ..... 20

## INTRODUCTION

Time is of the essence. Through 2025 Wisconsin Act 126 ("Act 126")[1], the State of Wisconsin has imposed an in-state residency requirement on anyone who may collect nomination signatures for candidates for public office, as well as on those who may collect signatures in support of a recall petition for public officeholders. These requirements plainly violate the First Amendment and must immediately be struck down.

Plaintiff Americans for Citizen Voting PAC ("ACV PAC"), a PAC that wishes to work with out-of-state residents to help collect nomination signatures in Wisconsin, is directly harmed by Act 126. Indeed, the residency requirements imposed by Act 126 severely burden Plaintiff's First Amendment rights because Plaintiff wants to engage out-of-state residents to help Wisconsin candidates that it supports gather nomination signatures, but Act 126's residency requirements prevent Plaintiff from doing so and significantly limit the pool of individuals and firms that Plaintiff may work with to advance its mission.

This issue is not unique. In *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), the Seventh Circuit made clear that such residency requirements (in that case, from the State of Illinois) violate the First Amendment. *Krislov* controls here. And this is not the first time this issue has come up in Wisconsin, either. More than two decades ago, the United States District Court for the Western District of Wisconsin declared

[1] Act 126 is available at https://docs.legis.wisconsin.gov/2025/related/acts/126.

the state's *previous* circulator residency requirements unconstitutional. *See Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003). This is not a close call, and this Court is now asked to do what was already done two decades ago: protect the First Amendment rights of out-of-state circulators to collect nomination signatures.

This matter is urgent. Candidates for the November 2026 General Election are *currently* collecting nomination signatures: the current collection window opened on April 15 and closes on June 1. On April 29, 2026—before Defendants removed this case to the United States District Court for the Eastern District of Wisconsin—Plaintiff moved for an Ex Parte Temporary Restraining Order and a Temporary Injunction in Waukesha County Circuit Court, which was scheduled for a hearing on May 12, 2026. Now, in this Court, Plaintiff similarly seeks a temporary restraining order and a preliminary injunction to stop the unconstitutional restrictions imposed by Act 126 and to restore Plaintiff's First Amendment right to facilitate the collection of nomination signatures.

Unless this Court acts—and quickly—Plaintiff will continue to be prevented from engaging fully in First Amendment-protected conduct and will continue to suffer irreparable harm.

## BACKGROUND

### A. Ballot access in Wisconsin

To obtain ballot access in Wisconsin, candidates must—among other things—file four documents by the deadline established for their requisite election: (1) A Declaration of Candidacy; (2) Nomination Papers; (3) A Campaign Restriction

Statement; and (4) A Statement of Economic Interest.[2] Nomination Papers are the focus of this lawsuit.

To successfully complete the Nomination Papers requirement, candidates must collect signatures from electors who reside within the jurisdiction of the position and/or office they seek. *See* Wis. Stat. §§ 8.10(2), (3); 8.15. The number of signatures each candidate must obtain varies by the office sought, but for some positions, the number of required signatures can be as high as 2,000 per candidate (in the case of statewide offices, for example). *See* Wis. Stat. §§ 8.10(3) 8.15(6).[3]

As relevant to this lawsuit, the person responsible for circulating the signature pages must sign a "certification of a qualified circulator" at the bottom of each page of nomination signatures. Wis. Stat. §§ 8.10(3), 8.15(4)(a). Between June 10, 2006, and March 26, 2026, a "qualified circulator" included out-of-state residents who would otherwise be eligible to vote in Wisconsin elections. *See* 2005 Wisconsin Act 451.[4] But under Act 126, only a "qualified elector of this state" may make such a certification, and therefore, only qualified *Wisconsin* electors may collect signatures for nomination papers. Wis. Stat. §§ 8.10(3), 8.15(4)(a), as amended by Act 126. Indeed, the

---

[2] Wisconsin Elections Commission, *Candidate Ballot Access Procedures Nomination Papers* at 2–7 Oct. 2023), available at https://elections.wi.gov/sites/default/files/documents/Ballot%20Access%20Manual%20Oct%202023.pdf

[3] *See also* Wisconsin Elections Commission, *Candidate Ballot Access Procedures Nomination Papers* at 4 (providing examples with statutory citations), available at https://elections.wi.gov/sites/default/files/documents/Ballot%20Access%20Manual%20Oct%202023.pdf.

[4] Available at https://docs.legis.wisconsin.gov/2005/related/acts/451.

signatures on each page that is *not* circulated by a "qualified elector of this state" may not be counted. Wis. Stat. § 9.10(2)(em)2, as amended by Act 126.

In addition to nomination papers, Act 126 likewise requires anyone circulating *recall petitions* to be "a qualified elector of this state." Wis. Stat. §§ 8.40(2)(b) (created by Act 126); 9.10(2)(em)2.

**B. The original Wisconsin residency requirements**

At the time *Krislov* was decided by the Seventh Circuit in the early 2000s, Wisconsin law also imposed a residency requirement on circulators which was substantially similar to Illinois' law. More specifically, the 2001 Wisconsin Statutes required anyone circulating nomination papers to ". . . reside[ ] within the district which the candidate named therein will represent . . ." Wis. Stat. § 8.15(4)(a) (2001).[5] That requirement was challenged in *Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003), and there, the United States District Court for the Western District of Wisconsin concluded that the requirement was unconstitutional as a violation of the First Amendment.

As described *supra,* Part A, Wisconsin's residency requirements changed in the Spring of 2006, following the Western District of Wisconsin's decision in *Frami*. *See* 2005 Wisconsin Act 451.[6] Under the post-Act 451 framework, nomination papers and recall petitions could be circulated by any person who is eligible to vote in Wisconsin, or is a U.S. Citizen age 18 or older who, if he or she were a Wisconsin resident, would

[5] Available at https://docs.legis.wisconsin.gov/2001/statutes/statutes/8/15.

[6] Available at https://docs.legis.wisconsin.gov/2005/related/acts/451.

otherwise be eligible to vote in Wisconsin. That framework stayed in place for decades after Act 451 was adopted.

### C. Wisconsin's latest attempt

On March 27, 2026, Act 126 was signed into law. And as explained above, Act 126 reimplemented new residency requirements for nomination paper circulators after a couple-decade hiatus. Specifically, Act 126 amends state law to provide that, in order to circulate nomination papers for a candidate for public office, or to circulate a recall petition, the circulator must be eligible to vote in Wisconsin. To be eligible to vote in Wisconsin, such a circulator must be a U.S. Citizen, age 18 or older, and must have resided in Wisconsin for at least 28 consecutive days. Wis. Stat. § 6.02. Out of-state residents whom Plaintiff may (and does) wish to work with in Wisconsin, are excluded from this definition because they are not residents of Wisconsin.

Act 126 exempts circulators of candidates for the offices of President and Vice President from the Wisconsin residency requirement. *See* Wis. Stat. § 8.20(3), as amended by Act 126. So, Plaintiff *could* engage out-of-state residents to circulate those particular nomination papers once every four years, but not for any other offices.

Specifically, Act 126 amends Wis. Stat. §§ 8.10(3)(intro.) (regarding nomination papers for Wisconsin's nonpartisan spring elections), 8.15(4)(a) (regarding nomination papers for Wisconsin's partisan fall elections), 8.20(3) (regarding nomination papers for independent candidates), 8.40(2) (regarding petition circulator requirements), and 9.10(2)(em)2. (regarding recall petitions) to

require that circulators must be a "qualified elector" of the State of Wisconsin (unless collecting signatures for President or Vice President, as just explained). Each of these residency requirement changes violates the First Amendment, as explained herein.

**D. Plaintiff**

Plaintiff Americans for Citizen Voting PAC ("ACV PAC") is a federal political action committee registered with the Federal Election Commission as a Hybrid PAC since December 27, 2023. Jacob Decl. ¶¶ 1, 3. It maintains its principal place of business in Fairfax, Virginia. Jacob Decl. ¶ 4. ACV PAC does not accept corporate contributions into its contribution account and is eligible to support candidates for state and federal office in the State of Wisconsin. Jacob Decl. ¶ 5.

ACV PAC's core mission is to promote election integrity by advocating for policies that ensure only U.S. citizens vote in American elections, and this mission includes supporting candidates who advance these goals across the country. Jacob Decl. ¶ 6.

One way ACV PAC seeks to advance its mission is to engage in independent expenditures to support candidates who are aligned with ACV PAC's goals. Jacob Decl. ¶ 7. Gathering nomination signatures for candidates for public office is another way in which ACV PAC advances its mission and supports those candidates. Jacob Decl. ¶ 8.

ACV PAC seeks to make expenditures to hire individuals to help collect nomination signatures for candidates for public office in the State of Wisconsin. Decl. Jacob ¶ 9. And more specifically, ACV PAC seeks to advance its mission by helping

candidates for public office that it supports in the State of Wisconsin gather nomination signatures during the current signature gathering period which opened on April 15, 2026 and ends on June 1, 2026. Decl. Jacob ¶ 10.

The residency requirements imposed by Act 126 require ACV PAC to engage only with Wisconsin electors to accomplish its goals, significantly limiting the pool of individuals and firms ACV PAC can work and associate with in support of its mission. Jacob Decl. ¶ 11–12. As a result, Act 126 directly harms ACV PAC's ability to advance its political beliefs, and to associate with candidates and supporters of its choosing. Jacob Decl. ¶¶ 12–13.

In furtherance of its mission, ACV PAC has entered into a Petition Agreement with DRW Campaigns, Inc. to engage in signature gathering on nominating petitions in support of Wisconsin state candidates. Jacob Decl. ¶ 14. DRW Campaigns, Inc. is based in Michigan and regularly hires petition circulators from around the country who are not qualified electors in Wisconsin. Jacob Decl. ¶ 14. Because of the residency requirements imposed by Act 126, the petition services to be provided by DRW Campaigns, Inc. under the Petition Agreement are contingent upon the issuance of a temporary or permanent injunction enjoining Act 126. Jacob Decl. ¶ 14.

## STATEMENT OF FACTS

On March 27, 2026, Governor Tony Evers signed 2025 Act 126 ("Act 126") into law in Wisconsin. *See* 2025 Wisconsin Act 126.[7] Act 126 reimplements new residency

[7] Available at https://docs.legis.wisconsin.gov/2025/related/acts/126.

requirements for nomination paper and recall petition circulators. More specifically, Act 126 amends Wis. Stat. §§ 8.10(3)(intro.), 8.15(4)(a), 8.20(3), 8.40(2), and 9.10(2)(em)2. to require that nomination paper and recall petition circulators be a "qualified elector of this state." *Id.* The only exception to the "qualified elector of this state" requirement imposed by Act 126 is with respect to presidential/vice-presidential nomination papers. *Id.*

Before Act 126, Wisconsin law permitted out-of-state residents who would otherwise be eligible Wisconsin electors if they were Wisconsin residents to circulate nomination papers and recall petitions provided they complied with state law, including certification requirements. *Compare* 2025 Wisconsin Act 126 *with* 2005 Wisconsin Act 451[8].

In addition, Act 126 is not Wisconsin's first attempt at imposing residency requirements on circulators. More than two decades ago, Wisconsin law required that circulators "reside[] within the district which the candidate . . . will represent." Wis. Stat. § 8.15(4)(a) (2001). That requirement was challenged in federal court, deemed unconstitutional, and enjoined. *See Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003). Following *Frami*, Wisconsin removed this requirement from the statutes via 2005 Wisconsin Act 451. The requirement remained out of Wisconsin law until Act 126 reinserted it. *Compare* 2025 Wisconsin Act 126 *with* 2005 Wisconsin Act 451.

After Act 126 was enacted, the Wisconsin Elections Commission updated its "Nomination Paper for Partisan Office" template to add "I am a qualified elector of

[8] Available at https://docs.legis.wisconsin.gov/2005/related/acts/451.

Wisconsin" to the "Certification of Circulator." *See* Exhibit 1 to Plaintiff's Complaint (Dkt. 1-1:19–20). In addition, the Wisconsin Elections Commission sent a "communication" to "Wisconsin Candidates and Political Parties" explaining that, under Act 126, "Any person who is circulating nomination papers for the 2026 Fall Election cycle must reside in Wisconsin and must be qualified to vote in Wisconsin." *See* Exhibit 2 to Plaintiff's Complaint at 1–2, 4 (Dkt. 1-1:21–22; 24).

Nomination papers for the November 2026 general election began to be circulated on April 15, 2026. *See* Wis. Stat. 8.15(1). On that day, the Wisconsin Elections Commission posted on its X.com social media account (@WI_Elections): "It's go time! Candidates can begin circulating nomination papers today for the Aug. 11 election! FYI: Under a new law, circulators must live in WI & be qualified to vote in the state." *See* Exhibit 3 to Plaintiff's Complaint (Dkt. 1-1:25).

Paul Jacob is the Chairman of Plaintiff Americans for Citizen Voting PAC ("ACV PAC"). Jacob Decl. ¶ 1. ACV PAC is a federal political action committee registered with the Federal Elections Commission as a Hybrid PAC since December 27, 2023. Jacob Decl. ¶ 3. ACV PAC maintains its principal place of business in Fairfax, Virginia. Jacob Decl. ¶ 4. ACV PAC does not accept corporate contributions into its contribution account and is eligible to support candidates for state and federal office in the State of Wisconsin. Jacob Decl. ¶ 5. ACV PAC's core mission is to promote election integrity by advocating for policies that ensure only United States citizens can vote in American elections. Jacob Decl. ¶ 6. This mission includes supporting candidates throughout the country who advance these goals. Jacob Decl. ¶ 6.

One way ACV PAC seeks to advance its mission is to engage in independent expenditures to support candidates who are aligned with ACV PAC's goals. Jacob Decl. ¶ 7. Gathering nomination signatures for candidates for public office is one way in which ACV PAC advances its mission and supports those candidates. Jacob Decl. ¶ 8.

ACV PAC seeks to make independent expenditures to hire individuals to help collect nomination signatures for candidates for public office in the State of Wisconsin. Jacob Decl. ¶ 9. More specifically, ACV PAC seeks to advance its mission by helping candidates for public office that it supports in the State of Wisconsin gather nomination signatures during the current signature gathering period which opened on April 15, 2026 and ends on June 1, 2026. Jacob Decl. ¶ 10.

Because of the changes to Wisconsin law implemented by 2025 Wisconsin Act 126 ("Act 126"), ACV PAC is now required to engage with only Wisconsin electors in collecting nomination signatures and is prohibited from working with out-of-state residents to gather nomination signatures for candidates, significantly limiting the pool of individuals and firms ACV PAC is permitted to work with to advance its mission. Jacob Decl. ¶ 11. These requirements impede ACV PAC's ability to communicate its political messages by limiting its ability to support candidates of its choosing, including by limiting who ACV PAC may associate with to advance its goals. Jacob Decl. ¶ 12. As a result, Act 126 directly harms ACV PAC's ability to advance its political beliefs, and to associate with candidates and supporters of its choosing. Jacob Decl. ¶ 13.

In furtherance of its mission, ACV PAC has entered into a Petition Agreement with DRW Campaigns, Inc. to engage in signature gathering on nominating petitions in support of Wisconsin state candidates. Jacob Decl. ¶ 14. DRW Campaigns, Inc. is based in Michigan and regularly hires petition circulators from around the country who are not qualified electors in Wisconsin. Jacob Decl. ¶ 14. Because of the residency requirements imposed by Act 126, the petition services to be provided by DRW Campaigns, Inc. under the Petition Agreement are contingent upon the issuance of a temporary or permanent injunction enjoining Act 126. Jacob Decl. ¶ 14.

Act 126 severely burdens Plaintiff's First Amendment rights because Plaintiff wants to engage out-of-state circulators to help Wisconsin candidates that it supports gather nomination signatures during the current signature gathering period—but is prohibited from doing so in Wisconsin because of Act 126.

As explained below, petition circulation is core political speech, and Act 126 unlawfully restricts Plaintiff's core political speech and associational rights, which are protected by the First Amendment.

## LEGAL STANDARD

The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions. *See Long v. Bd. of Educ., Dist*. 128, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). A party seeking a temporary restraining order or preliminary injunction must demonstrate "(1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co*., 971 F.2d 6, 11

(7th Cir. 1992) (citation omitted). If a plaintiff meets these factors, the court proceeds to "a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyde*rs, 990 F.3d 539, 545 (7th Cir. 2021).

In First Amendment cases like this one, "the loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury," *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), and "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Thus, the likelihood of success "is usually the decisive factor," *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014), such that the analysis often "begins and ends with . . . the merits." *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1116–18 (7th Cir. 2017) (citation omitted).

**ARGUMENT**

The residency requirements imposed by Act 126 directly harm ACV PAC by restricting its ability to advance its political beliefs. Plaintiff meets all requirements for an immediate temporary restraining order, as well as a preliminary injunction.

**I. Plaintiff is likely to succeed on the merits.**

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend.

I. "The First Amendment applies to the states by the Due Process Clause of the Fourteenth Amendment." *Nicodemus v. City of S. Bend,* 137 F.4th 654, 663 n. 7 (7th Cir. 2025) (*citing Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625 (1925)).

Circulating petitions is "core political speech" and is where the First Amendment protection is "at its zenith." *Buckley v. American Constitutional Law Found., Inc*. 525 U.S. 182, 186 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)). Because residency requirements on petition circulators, like those imposed by Act 126, impose severe burdens on free speech, strict scrutiny applies to residency requirements.

Under the provisions of Act 126, only Wisconsin residents are eligible to circulate nomination papers for candidates for public office. Plaintiff seeks to work with individuals who are not Wisconsin residents in order to collect signatures for candidates that Plaintiff supports in furtherance of its political goals and mission. Jacob Decl. ¶¶ 9–14. But Act 126 prohibits that activity, and prohibits the Plaintiff from associating with individuals of its choosing to advance its political beliefs and goals. Jacob Decl. ¶¶ 11–14. Thus, the residency restrictions imposed by Act 126 severely burden Plaintiff's rights under the First Amendment, and Plaintiff is highly likely to succeed on the merits of this claim.

Since *Buckley*, a number of federal courts have invalidated state law residency requirements like those imposed by Act 126. And as Plaintiff explained earlier, that includes the United States District Court for the Western District of Wisconsin regarding a previous attempt by the State of Wisconsin to impose such a requirement.

*See Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003). In addition, the residency requirements imposed by Act 126 have been declared unconstitutional by the Seventh Circuit. *See Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000). All Plaintiff asks is for this Court to do exactly what was done more than twenty years ago: declare this latest attempt to impose residency requirements on nomination paper circulators to be unconstitutional.

The Seventh Circuit and the United States District Court for the Western District of Wisconsin are not alone in reaching these conclusions—nearly *every* federal Court of Appeals has come to the same conclusion. *See Lerman v. Board of Elections in City of New York*, 232 F.3d 135 (2nd Cir. 2000) (invalidating New York's residency requirement for witnessing candidate designating petitions as a violation of the First Amendment); *Chandler v. City of Arvada*, 292 F.3d 1236 (10th Cir. 2002) (invalidating a city regulation prohibiting nonresidents from circulating petitions as a violation of the First Amendment); *Yes on Term Limits v. Savage*, 550 F.3d 1023 (10th Cir. 2008) (invalidating Oklahoma's statutory ban on nonresident petition circulators as a violation of the First Amendment); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (striking down a residency requirement for petition circulators as a violation of the First Amendment); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (invalidating Arizona's residency requirement for nomination petition circulators as a violation of the First Amendment); *Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022) (striking down Montana's residency requirement for petition circulators as a violation of the First Amendment); *Libertarian Party of Va. v. Judd*, 718 F.3d 308 (4th Cir.

2013) (invalidating Virginia's residency requirement for petition circulation as a violation of the First Amendment); *Wilmoth v. Secretary of New Jersey*, 731 Fed. App'x. 97 (3d Cir. 2018) (finding New Jersey's residency requirement for circulators imposed severe burden on First Amendment rights, and remanding for further proceedings); *We the People PAC v. Bellows* 40 F.4th 1 (1st Cir. 2022) (affirming an injunction against Maine's residency requirement for petition circulators on First Amendment grounds); *but see Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) (upholding North Dakota's residency requirement).

Here, and like the many other state laws that have tried to impose residency requirements before, the restrictions imposed by Act 126 are not narrowly tailored to serve a compelling state interest and are therefore unconstitutional. Indeed, the State of Wisconsin can have no compelling state interest to block non-residents from collecting nomination signatures for candidates. As the Seventh Circuit explained: "circulating nomination petitions necessarily entails political speech, it follows that the First and Fourteenth Amendments compel States to allow their candidates to associate with non-residents for political purposes and to utilize non-residents to speak on their behalf in soliciting signatures for ballot access petitions." *Krislov*, 226 F.3d at 866.

And even if the state's interests could be compelling here, they are not narrowly tailored. As the Western District of Wisconsin explained in *Frami*, "because the registration requirement substantially burdens First Amendment rights, only narrowly tailored means can be used to achieve the state's goals . . .". 255 F.Supp.2d

at 970. The Court then went on to explain that the residency requirements challenged there were not "narrowly tailored to facilitate the state's ability to locate out-of-state petition circulators and discourage fraud." *Id.* Nor were they narrowly tailored to "insuring that residents of other states who circulate petitions are subject to the state's judicial processes . . ." *Id.* Nor were they narrowly tailored to prevent any alleged fraud from occurring. *Id.* at 970–71.

Wisconsin's latest attempt to impose residency requirements is substantially similar to what the Western District of Wisconsin considered in *Frami* and the analysis should be the same here. These provisions are not narrowly tailored to any compelling government interest.

Plaintiff is substantially likely to succeed on the merits of its claim that the challenged residency requirements imposed by Act 126 violate the First Amendment, and so this factor of the test is met.

## II. Plaintiff will suffer irreparable harm if preliminary relief is denied and has no other adequate remedy at law.

In First Amendment cases like this one, "the likelihood of success on the merits will often be the determinative factor," such that "the analysis begins and ends with" its discussion. *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (first quoting *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012), then quoting *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013)). This is because "even short deprivations of First Amendment rights constitute irreparable harm, and 'the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by

preliminarily enjoining the enforcement of [an ordinance] that is probably unconstitutional.'" *Id.* (quoting *Am. Civil Liberties Union*, 679 F.3d at 589-90; *see also, e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest.").

Indeed, constitutional violations constitute "*proof* of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303, n.3 (7th Cir. 1978). And here, Plaintiff's constitutional rights have been, and are continuing to be, denied by Act 126 which is administered and enforced by Defendants. Again, nomination papers for the November 2026 General Election began circulating in Wisconsin on April 15, 2026, and can only be circulated through June 1, 2026. Wis. Stat. § 8.15(1). Plaintiff seeks to make expenditures to hire individuals to help collect nomination signatures for candidates for Wisconsin public office, but because of Act 126, Plaintiff cannot work with out-of-state residents to gather nomination signatures for the Wisconsin candidates it supports, significantly limiting the pool of individuals and firms Plaintiff can work with to advance its mission. Jacob Decl. ¶¶ 9–13. This First Amendment violation subjects the Plaintiff to irreparable harm.

Lastly, Plaintiff has no other adequate remedy at law. The statutes do not allow Plaintiff to engage out-of-state residents to collect valid signatures on behalf of Wisconsin candidates, so without an injunction, Plaintiff will not be able to work with out-of-state circulators (including those supplied by DRW Campaigns, Inc., with

whom ACV PAC has entered into a Petition Agreement) to participate in the current signature collecting period. Jacob Decl. ¶¶ 9–14. Plaintiff's only option is to seek a judicial remedy, which Plaintiff is doing with this action.

### III. A balance of the harms and the public interest favors granting preliminary relief.

"Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas—the freedom to associate." *Christian Legal Society v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (citing cases). That is exactly what Plaintiff seeks to do: associate with candidates and supporters of its choosing by facilitating the circulation of nomination papers.

Courts have recognized that "[a]ssociating for the purpose of placing a candidate on the ballot is one of the actions protected by the First Amendment; indeed the circulation of petitions for ballot access 'involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'.'" *Krislov,* 226 F. 3d at 858 (quoting *Meyer,* 486 U.S. at 421–22). In addition, and applying *Krislov*, Judge Crabb wrote in *Frami*—before striking the down Wisconsin's previous residency requirements—that *Krislov* casts serious doubt on the constitutional validity of the Wisconsin [residency requirements] challenged in [that] case." *Frami*, 255 F. Supp. 2d at 967. Furthermore, "[i]t is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Faust v. Vilsack*, 519 F. Supp. 3d 470, 477 (E.D. Wis. 2021) (quoting *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.,* 274 F.3d 377, 400 (6th Cir. 2001)).

A temporary restraining order or an injunction will not cause *any* harm to Defendants. With respect to Defendants, the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy.").

Plaintiff, on the other hand, is unable to work with individuals of its choosing to collect signatures in Wisconsin, and Plaintiff's First Amendment rights are being denied. See Jacob Decl. ¶¶ 9–14. Issuing the temporary relief requested herein would simply preserve the status quo and allow Wisconsin's current signature collection period to operate exactly as previous signature collection periods have operated for the past two decades, harming no one. The balancing of the equities weighs heavily in favor of the injunction.

**RELIEF SOUGHT**

For all of the reasons explained above, this Court should immediately grant Plaintiff's motion for a temporary restraining order while it considers Plaintiff's motion for a preliminary injunction. The factors for granting such relief are clearly met here: the residency requirements imposed by Act 126 are a direct violation of Plaintiff's First Amendment rights, and because such violations cause irreparable harm for which there is no other adequate remedy at law, Plaintiff's request for injunctive relief is in the public interest.

As Plaintiff's Complaint makes clear, this lawsuit seeks permanent declaratory and injunctive relief against Act 126. *See* Dkt. 1-1,10–25. But time is of the essence here because the current window for circulating nomination papers runs from April 15 to June 1. Accordingly, it is imperative that this Court immediately issues a temporary restraining order while it considers Plaintiff's request for a preliminary injunction until the merits of the case—though clearly in favor of Plaintiff—can be fully addressed.

**CONCLUSION**

Plaintiff respectfully asks this Court to immediately issue a temporary restraining order while it considers Plaintiff's request for a preliminary injunction for the pendency of this litigation.

Given the short timeframes involved, and the unpredictable nature of this litigation, Plaintiff reserves the right to request further relief with the Court, which may include extending the June 1 deadline. Finally, Plaintiff respectfully requests that if this Court is not inclined to grant temporary relief, that it denies both motions quickly to permit Plaintiff time to seek emergency review at the Seventh Circuit.

Dated: May 4, 2026.

Respectfully Submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

*Electronically signed by Nathalie E. Burmeister*
Lucas T. Vebber (#1067543)
Daniel P. Lennington (#1088694)
Nathalie E. Burmeister (#1126820)

1241 N. Franklin Place
Milwaukee, WI 53202

Phone: (414) 727-9455
lucas@will-law.org
dan@will-law.org
nathalie@will-law.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

v. Case No. 26-CV-0786

MEAGAN WOLFE, et al.,

Defendants.

# DEFENDANTS' BRIEF IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## INTRODUCTION

Plaintiff Americans for Citizen Voting PAC seeks a preliminary injunction facially enjoining amendments to Wisconsin laws, 2025 Wisconsin Act 126, that requires circulators for candidate nomination papers and recall petitions to be eligible to vote in Wisconsin. Circulators carry out important duties relating to the truth and accuracy of voter signatures, which are reviewed in fast-moving ballot access challenges, and they are subject to criminal penalties for fraudulent activity. Act 126 furthers Wisconsin's interest in ensuring the integrity of Wisconsin elections and deterring fraud.

Plaintiff's effort to enjoin the law should be denied because it fails to satisfy the four requirements for such relief.

Out of the gate, Plaintiff does not make a strong showing that it is likely to succeed on the merits. It relies on case law reviewing more restrictive limits on who can serve as circulators or where advocates faced greater hurdles, or laws governing Presidential elections. It cites no case that has struck down a requirement that a candidate's nomination paper circulator simply be eligible to vote, a rule that creates a pool of millions of potential circulators.

Even if it could pass the merits prong, Plaintiff cannot satisfy the remaining required factors for relief. It does not demonstrate that it will suffer irreparable harm absent a preliminary injunction. It relies on a presumption of irreparability and offers no proof of objective, immediate harm. Further, the

balance of equities and the public interest weigh against the issuance of a preliminary injunction. Under *Purcell*, the Court should not make changes in election law while that process is in motion, and enjoining duly enacted state statutes constitutes irreparable harm to the State and people of Wisconsin. And Plaintiff's delay in seeking relief also weighs against its request.

## STATEMENT OF FACTS

### I. The process for the circulation of nomination papers and recall petitions has been underway for weeks.

Wisconsin law creates an interlocking, front-to-back process for elections that begins with circulating papers for signatures for the nomination of candidates and for recall petitions. Wis. Stat. §§ 8.10 (nominations for spring elections), 8.15 (nominations for partisan primary), 8.20 (nominations of independent candidates), and 9.10 (recall petitions); *see also* Wis. Admin. Code EL § 2.05. For the 2026 fall elections, the signature process has been underway since April 15, 2026. *See* Wis. Stat. §§ 8.15(1) (partisan candidates), 8.20(8)(a) (independent candidates); (*see also* Kehoe Decl. ¶¶ 14–15). Nomination papers must be filed by June 1, 2026. Wis. Stat. §§ 8.15(1), 8.20(8)(a); (*see also* Kehoe Decl. ¶ 16). Candidates must gather between a few hundred to a few thousand signatures, depending on the office: for state senate, 400 to 800 signatures are required, while for Governor, 2,000 to 4,000. Wis. Stat. § 8.15(6)(c), (a).

### II. Circulators, who must be eligible to vote in Wisconsin, provide a certification about to the signatures collected for a candidate non-presidential candidate.

Circulators assist a candidate in obtaining the required number of signatures for a candidate's nomination papers or for a recall election to occur. *See* Wis. Stat. §§ 8.10, 8.15, 8.20, 9.10; (*see also* Kehoe Decl. ¶ 7). Circulators must provide a certification attesting to the facts relating to the signature and signer. Wis. Stat. §§ 8.15(4)(a), 8.20(3), 8.40(2). Under Act 126, circulators must also be eligible to vote in Wisconsin. 2025 Wis. Act 126; (*see also* Kehoe Decl. ¶ 9); (Dkt. 1-1:21).[1] The voter-eligibility requirement does not apply to presidential/vice-presidential candidate papers or to referendum petitions. *See* 2025 Wis. Act 126; (*see also* Kehoe Decl. ¶ 6). Neither Act 126 nor any other provision of Wisconsin law prevents others—whether Wisconsin residents or otherwise—from accompanying a circulator or advocating alongside a circulator during signature collection. (Kehoe Decl. ¶ 28.)

### III. The election process proceeds speedily, with a tight window for challenges to nomination papers.

Wisconsin's election process proceeds in fast-moving, interlocking steps. After nomination papers are submitted, opponents may challenge the validity or adequacy of nomination papers and recall

[1] The online version of the Wisconsin statutes has not yet been updated to include Act 126's changes. The PDF of Act 126, which provides all the changes in full, is available online here: https://docs.legis.wisconsin.gov/2025/related/acts/126.pdf (last visited May 8, 2026).

petitions. Wis. Admin. Code EL §§ 2.07, 2.11; *see also* Wis. Stat. § 8.07. For the upcoming 2026 elections, for nomination papers filed by June 1, 2026, challenges must be made by June 4, 2026. Wis. Admin. Code EL § 2.07(3)(b); (*see also* Kehoe Decl. ¶ 30). Those challenges must be then decided by the filing officer (the Commission or filing officer, depending on the office) not later than June 10, 2026. Wis. Admin. Code EL § 2.07(3)(h); (*see also* Kehoe Decl. ¶ 34).

The Commission must then certify the list of candidates as soon as possible after the June 10, 2026, ballot determination deadline. Wis. Stat. § 10.06(1)(h); (*see also* Kehoe Decl. ¶ 35). Upon receiving certifications from the Commission, county clerks must arrange to have those ballots printed and delivered to each municipal clerk in the county by June 24, 2026. Wis. Stat. § 7.10(1)(a), (2), (3)(a); (*see also* Kehoe Decl. ¶ 42). Municipal clerks must then send absentee ballots to voters with an absentee ballot request on file—including military and overseas voters—by June 25, 2026. Wis. Stat. §§ 7.15(1)(cm), 7.22, 7.24; 52 U.S.C. § 20302(a)(8); (*see also* Kehoe Decl. ¶ 42).

## IV. In 2024, petitions to recall Robin Vos led to signature challenges and a and a separate criminal referral by the Commission.

In 2024, Wisconsin saw multiple unsuccessful petitions to recall Representative Robin Vos. Petitions were subject to challenges by Representative Vos, (*see* Kehoe Decl. ¶¶ 47–48, Ex. A–B), and separately, in

2026, the Commission made a criminal referral to the Racine County District Attorney, (Kehoe Decl. ¶¶ 48–50, Ex. C).

The Commission investigates violations of Wisconsin's election laws upon submission of a complaint to the Commission. Wis. Stat. §§ 5.05, 5.06. It found probable cause to believe that violations of Wisconsin law occurred related to efforts to recall Representative Vos. (Kehoe Decl. ¶¶ 48–50, Ex. C.)

As reflected in its February 27, 2026, letter to the District Attorney, the Commission found probable cause to believe that people had falsely listed an address that was not their residence on the circulator certification signed. (Kehoe Decl. ¶ 49, Ex. C.) The Commission also found probable cause to believe that multiple persons violated Wisconsin law prohibiting falsifying or fraudulently defacing or destroying a recall petition, given evidence from several individuals who attested that they had not actually signed the recall petition at issue. (Kehoe Decl. ¶ 50, Ex. C.)

In a separate proceeding, challenging one of the petition's signature sufficiency,[2] Speaker Vos asserted that a private investigator found that four out-of-state convicted felons circulated 94 recall papers, (*id.* at 5), and that an "alarming number of people ha[d] come forth to state that their names were

---

[2] (Kehoe Decl. Ex. A.) Speaker Vos submitted verified challenges to multiple recall petitions. (*See* Kehoe Decl. ¶¶ 47–48, Ex. A–B.) The exhibits to Speaker Vos's verified challenge dated June 7, 2024, are available online on the Commission's website as part of the Commission's Open Session Materials from June 27, 2024, available at: June 2024 Quarterly Meeting 6/27/2024 | Wisconsin Elections Commission (last visited May 8, 2026).

fraudulently included in the recall petitions," including multiple minors, (*id.* at 8). Speaker Vos explained that a woman attested that she was approached by two men in a parking lot who asked if she would sign a petition supporting "women's rights," that she was prevented from getting into her car until she signed the petition, and that the petition she signed proved to be a recall petition. (*Id.*)

### V. Plaintiff filed suit on April 29, 2026, over one month after Act 126's enactment and two weeks after the nomination paper circulation period began.

On April 29, 2026, over one month after Act 126's enactment on March 27, 2026, and two weeks after the circulation period for nomination papers began, Plaintiff brought suit in state court, raising facial challenges to Act 126's provisions. (Dkt. 1-1:10–18.)

Plaintiff is based in Fairfax, Virginia, and alleges that it seeks to support candidates who "promote election integrity" and "support policies that ensure only United States citizens vote in American elections." (Dkt. 1-1:12.) It asserts that it wishes to work with persons who do not reside in Wisconsin "to collect nomination signatures in Wisconsin." (Dkt. 1-1:12.) In support of its motion for preliminary injunction, it notes that it has entered into an agreement with a Michigan-based entity that hires petition circulators. (Dkt. 6-5:3.)

The Commission removed this matter on May 4, 2026. (Dkt. 1.) Plaintiff moved for a temporary restraining order and preliminary injunction that

day. (Dkt. 6.) It reserves the right to request further relief, "which may include extending the June 1 deadline." (R. 6-1:22.)

### VI. The interim relief Plaintiff seeks would pose significant challenges to the administration of Wisconsin's 2026 election.

A temporary injunction of Act 126 would pose significant administrative challenges for the Commission and county clerks and would risk confusion for the Wisconsin public. The circulator requirements apply to roughly 130 state and congressional offices and over 150 county offices. (Kehoe Decl. ¶ 15.)

Uncertainty about circulator requirements may create significant confusion for circulators, signers, candidates, county clerks, the Commission, and persons who may wish to raise challenges to nomination papers, conducted under two different laws. (Kehoe Decl. ¶¶ 36–38.) It may also create confusion amongst county filing officers, who are not defendants but who are responsible for determining challenges to nomination papers for county offices. (Kehoe Decl. ¶¶ 36–39, 31–32.)

Any extension of the June 1 deadline for filing nomination papers would have significant consequences for the election because of the tight timeline between each election step. (Kehoe Decl. ¶¶ 40–42.) Endangered would be the Commission and clerks' compliance with deadlines to certify candidates, create ballots, and send ballots to overseas voters. (Kehoe Decl. ¶¶ 41–42.)

## LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy and is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). It is a "very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)).

The moving party bears the burden to show that such extraordinary relief is warranted. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). To justify a preliminary injunction, a movant must satisfy *all* the relevant factors. The movant must make a "strong showing that she is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). If the movant makes such a showing, she "must also demonstrate . . . 'irreparable injury . . . in the absence of an injunction,' . . . [that] the balance of equities must 'tip in the [movant's] favor,' and [that] the 'injunction [is] . . . in the public interest.'" *Id.* at 763 (citation omitted).

Further, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). When balancing the equities, a moving party's unnecessary delay in requesting a preliminary injunction will weigh against their request. *Id.* at 160.

## ARGUMENT

### I. Plaintiffs do not show that they are likely to succeed on the merits.

Under the likelihood of success prong, the movant "must make a strong showing" that they are likely to succeed on the merits. *Pritzker*, 973 F.3d at 762. A "'better than negligible' chance" of success is not enough. *Id*. (citation omitted). Plaintiff cannot meet that standard here. Plaintiff relies on the Seventh Circuit's now superseded "some likelihood" of success standard (Dkt. 6-1:13 (citation omitted)), but that is not the law since *Pritzker*.

Act 126 imposes no severe burdens: anyone in Wisconsin eligible to vote can be a circulator, and Plaintiff offers no evidence that any candidate (or their advocates) faces hurdles in gathering signatures. Even if Act 126 were subject to heightened scrutiny, the State has compelling interests, and the law is narrowly tailored to address them. The candidate circulator regulations rejected by courts were different, imposing restrictions that significantly limited the pool of circulators or involved different types of elections.

#### A. While cases reviewing circulator regulations have gone in both directions, the most analogous cases support the constitutionality of Act 126.

Plaintiff tells the Court that the case law has decisively concluded that all eligibility-to-vote requirements for circulators, regardless of geographic scope, referendum or candidacy, or even type of candidacy, are unconstitutional. That is incorrect. Courts must examine the particulars of an

election regulation to determine its constitutionality, and a law like Act 126 passes muster.

### 1. States have broad leeway to regulate elections, and election regulations not posing a severe burden are subject to rational basis review.

In *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997), the Supreme Court recognized that while candidates and parties have First Amendment rights of association that enjoy constitutional protection, States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election and campaign-related disorder.

To decide whether a state election law violates the First or Fourteenth Amendment, courts "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Id.* at 358 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). While regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest, lesser burdens trigger less exacting review, "and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions." *Id.* (quoting *Burdick*, 504 U.S. at 434).

"[N]o litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious . . . . The rule is not self-executing and is no

substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

**2. In the context of referenda initiatives, the Supreme Court has examined whether the message can be carried to the State's voters, or faces significant hurdles in reaching the ballot.**

The seminal U.S. Supreme Court cases relating to regulation of signature gatherers, *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), both involved regulation of the signature-gathering process for initiatives. The Court's analysis focused on the actual burden imposed on the message's reaching the people and ability to come before the people on the ballot.

In *Meyer*, the Court struck down a law that prohibited paying people to circulate initiatives or referenda petitions, a job that the Court interpreted to include "persuad[ing] [voters] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate." *Meyer*, 486 U.S. at 421. The Court concluded that the regulated activity of promoting an initiative would "in almost every case involve an explanation of the nature of the proposal and why its advocates support it." *Id.* at 421–22.

The Court identified two considerations to aid in determining whether an initiative regulation imposes a severe burden triggering heightened scrutiny: the extent to which it limits the number of voices carrying the

initiative proponent's message and size of the audience the proponent can reach; and the extent to which the regulation makes it less likely the measure will reach the ballot, the mechanism for the issue to be "the focus of statewide discussion." *Id.* at 422–23.

In *Buckley*, the Court considered requirements imposed by Colorado on signatures for constitutional initiatives. *Buckley*, 525 U.S. at 205. The plaintiffs had challenged multiple provisions of a law imposing hurdles to citizen-initiated referenda; the Tenth Circuit had rejected some, including that an initiative-petition gatherer be registered to vote and wear a badge with their name and volunteer status. *See Am. Const. L. Found., Inc. v. Meyer*, 120 F.3d 1092, 1096 (10th Cir. 1997). The Supreme Court affirmed the Tenth Circuit's decision. *Buckley*, 525 U.S. at 186.

The Court began by recognizing that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* at 187 (citation omitted). The Court reasoned that the legal questions surrounding initiative petition gatherers were a hybrid of two different strands of law: those relating to candidate-petition circulators, which relied on ballot access principles in *Timmons*, and handbill distributors advocating for change, governed by *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995).

The Court then assessed the burden caused by Colorado's voter registration requirement. The Court pointed to the plaintiffs' evidence that requiring registration, and not just eligibility to vote in Colorado (which Colorado also required), reduced the pool of potential gatherers from Colorado's adult population by about 400,000, which both significantly decreased the number of voices who would convey the proponents' message and substantially reduced the chances that the initiative would reach the ballot. *Buckley*, 525 U.S. at 194–95.

The Court did not determine the constitutionality of Colorado's separate eligibility-to-vote requirement, which the plaintiffs had not challenged. *Id.* at 197. But it reasoned that Colorado's interest in being able to locate and subpoena circulators to investigate the validity of signatures was met by the requirement that they attest to their Colorado address. *Id.* at 196.

In dissent, Chief Justice Rehnquist suggested the majority's decision would be read to preclude States from imposing an elector or residency requirement, suggesting that children or foreign citizens must be permitted and many state laws would appear to be "in serious constitutional jeopardy." *Id.* at 231–32 (Rehnquist, C.J., dissenting). The majority rejected his concerns, quoting Judge Bork that "[j]udges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom." *Id.* at 194 n.16.

### 3. Lower courts have since rejected laws requiring petition circulators to live in a subdivision of a State, but are divided on laws requiring only statewide presence or eligibility.

Since *Buckley*, numerous courts have considered state and local laws that regulate who may circulate initiative petitions. While they have rejected laws that limit the pool of circulators to residents of political subdivisions like cities or counties, they are divided on whether a State can require that a circulator be a resident or eligible to vote in the State as a whole.

Courts agree that laws or ordinances requiring petition circulators to live in a particular subdivision of a State, like a particular state assembly district, are unconstitutional. This is unsurprising, since such laws limit the pool of potential circulators dramatically.

For example, in *Chandler v. City of Arvada*, 292 F.3d 1236, 1244 (10th Cir. 2002), the Tenth Circuit invalidated an ordinance that required petition circulators to be residents of the City of Arvada. The court reasoned that such circulators are like handbill distributors seeking to garner public support for a viewpoint, and that it is "no small undertaking" to get a measure on the ballot. *Id.* at 1241 (citation omitted); *see also KZPZ Broad., Inc. v. Black Canyon City Concerned Citizens*, 13 P.3d 772 (Ariz. Ct. App. 2000) (requiring county residency); *Preserve Shorecliff Homeowners v. City of San Clemente*, 158 Cal.App. 4th 1427, 1443–44 (Cal. Ct. App. 2008) (ordinance requiring referendum circulators to be city residents).

In contrast, where any person eligible to vote in a State can serve as a circulator, the circuits have reached differing conclusions.

Two circuits have concluded that such regulations are not even subject to heightened scrutiny. The Eleventh Circuit concluded that a Florida law requiring petition circulators to be eligible to vote in Florida did not trigger heightened scrutiny because it did not substantially limit the ability of noncitizens and nonresidents to speak on the issue. *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, *4 (11th Cir. Sept. 9, 2025). The law required circulators to collect and deliver petitions, which the court doubted "was speech at all." *Id.* And the court reasoned that the law did not prohibit noncitizens or nonresidents from engaging those voters in persuasive speech for their views. *Id.*

In *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001), the Eighth Circuit concluded that no heightened scrutiny was appropriate because the regulation there, which required North Dakota residency, caused no significant drop-off in the number of potential circulators: "all 476,000 of North Dakota's eligible voters may circulate petitions, unlike the situation in *Buckley*, where many Colorado residents would have been unable to engage in petition circulation." *See also Idaho Coal. United For Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1163–64 (Idaho 2001) (applying reasonableness standard to residency requirement).

Some district positions have taken an intermediate position, requiring heightened scrutiny but finding that the State met that standard. In *Kean v. Clark*, 56 F. Supp. 2d 719, 732 (S.D. Miss. 1999), for example, the court held there were compelling interests in requiring initiative circulators to be eligible to vote in the State, discussing the State's concern that it could not effectively prosecute criminal violations by out-of-state circulators.

The Tenth, Ninth, and First Circuits have rejected laws that imposed residency requirements for initiative circulators. In *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1026 (10th Cir. 2008), the Tenth Circuit concluded that strict scrutiny applied to its review of an Oklahoma residency requirement where the plaintiffs asserted there were not enough professional initiative circulators in Oklahoma to gather signatures. In *Pierce v. Jacobsen*, 44 F.4th 853, 859 (9th Cir. 2022), and *We the People PAC v. Bellows*, 40 F.4th 1, 18 (1st Cir. 2022), the Ninth and First Circuits rejected residency requirements for petition circulators, relying on *Meyer*'s statement that advocating for initiatives was "core political speech" involving "interactive communication concerning political change." Under that framework, the courts concluded that it didn't matter whether referendum proposals were successfully reaching the ballot. *Pierce*, 44 F.4th at 861; *We the People PAC*, 40 F.4th at 18.

### 4. For candidate signature circulators, state residence has been rejected only in the context of Presidential candidacies.

*Meyer* and *Buckley* did not address regulations for *candidate* signature gathering. *Buckley* recognized that campaign nomination papers fall under *Timmons*, and courts reviewing regulations about candidate signature circulators have generally focused on the burden they place on candidates to gain access to the ballot. Only in the context of Presidential elections, where the States' interests carry less weight than other election contests, have courts rejected state residency regulations standing alone.

Two circuits have rejected candidate signature regulations that limited participation far more strictly than statewide residence. In *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), and *Lerman v. Board of Elections of N.Y.*, 232 F.3d 135 (2d Cir. 2000), the Seventh and Second Circuits struck down two candidate circulator laws: an Illinois statute that required circulators to be registered to vote and to live in the district of the relevant office, and a New York law that required circulators to be registered to vote in the candidate's party and be a resident of the office's political subdivision. *Krislov*, 226 F.3d at 856; *Lerman*, 232 F.3d at 139.

In both cases, the plaintiffs presented evidence that the laws created significant hurdles to their appearance on the ballot. In *Krislov,* the two plaintiffs faced challenges that some circulators were not registered voters in

the relevant districts; the plaintiff who wanted to run for the U.S. House of Representatives also needed to find registered voters living in his congressional district. *Id.* at 856. In *Lerman*, the candidate wanted to run for the New York City Council, but there were only 760 people who were eligible circulators, and he did not appear on the ballot. *Lerman*, 232 F.3d at 139, 147.

In striking down the two laws, the courts focused on the number of circulators excluded. *Krislov* held that "[w]hat is particularly important in this case, and what was correctly the focus of the district court's attention, is the number of people the registration and residency requirements exclude." *Krislov*, 226 F.3d at 860. The court compared the number of people eligible under the law to all adult Illinois residents, resulting in a reduction "in the millions," *Lerman* concluded that the New York provision severely burdened political speech by "drastically reduc[ing] the number of persons . . . available to circulate petitions." *Lerman*, 232 F.3d at 146 (alteration in original) (citation omitted).

In dicta, *Lerman* said that a statewide residency requirement, standing alone, *would* pass constitutional muster. The court reasoned that the State's interest in protecting the integrity of elections was achieved by the "less burdensome" requirements that petition gatherers live in the State of New York, subjecting them to the State's subpoena power, and providing their residence address. *Id.* at 150. And *Krislov* noted that the State could regulate

non-citizen circulators if it presented a compelling interest like deterring fraud. *Krislov*, 226 F.3d at 866 n.7.

In *Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003), the district court applied the same framework to a Wisconsin law that required circulators to live in a specific political district. The court found that the restrictive geography created a significant burden for the plaintiffs, who were members of a small third party, and concluded that the State did not provide compelling reasons for the local requirement. *Id.* at 965, 968.

As to laws allowing circulators from anywhere in a State or simply voter-eligible, challenges have reached the appellate courts only in the context of *presidential* campaigns. The Supreme Court has explained that States have reduced interests in election regulations that govern presidential elections because their results affect every person in the United States:

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

*Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) (footnotes omitted). Thus, even where a statewide or voter-eligibility requirement would normally pass

muster, it does not in the presidential candidacy setting. *See Daien v. Ysursa*, 711 F. Supp. 2d 1215, 1233 (D. Idaho 2010).

Thus, in three suits brought by third party candidates for President or their supporters, courts held that States could not limit out-of-state voters gathering candidate signatures to residents of that State. *See Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013).

### B. Act 126's provisions are constitutional; they do not severely burden speech, and even if they were subject to heightened scrutiny, the State has compelling interests and a narrowly tailored solution.

Here, Wisconsin's law presents none of the severe burdens that caused some courts to invalidate other types of circulator regulations. Plaintiff makes no effort to show that the law severely burdens candidates in procuring enough signatures to appear on the ballot; most of the circulator's duties are not even speech. And Act 126's provisions do *not* apply to circulators for referenda or presidential candidates, so the First Amendment concerns in those contexts have no bearing here.

Even if Wisconsin's law were subject to heightened scrutiny, it would pass that test. The Supreme Court has recognized that preventing fraud and ensuring the integrity of elections are compelling interests, and Act 126 is narrowly tailored to address those concerns.

### 1. Wisconsin's circulator tasks either involve no speech or do not severely burden the ability of candidates to appear on the ballot.

To begin, Act 126 does not impose severe burdens on speech. Most of the circulator's duties do not involve advocacy, and the one duty that may involve speech creates no severe burdens on candidates, who may draw on almost any adult Wisconsinite to serve in the role.

Wisconsin law requires candidate nomination papers to be accompanied by a signed and dated statement by the "qualified circulator" (who may also be the candidate him- or herself), certifying to seven things:

- He or she personally circulated the nomination paper and personally obtained each of the signatures;
- He or she knows they are electors of the ward, aldermanic district, municipality or county, as the nomination papers require;
- He or she knows they signed the paper with full knowledge of its content;
- He or she knows their respective residences given;
- He or she knows each signer signed on the date stated opposite his or her name;
- He or she intends to support the candidate; and
- He or she is aware that falsifying the certification is punishable under Wis. Stat. § 12.13(3)(a).

*See* Wis. Stat. §§ 8.15(4)(a), 8.20(3).

Of the seven attestations, six—all but the attestation of personally circulating and obtaining each signature—have nothing to do with urging others to support a candidate. They instead ensure that the signatures contain

the requirements for valid signatures required by state law, compliance with which could be challenged in an opponent's challenge to the candidate's nominating papers. The circulator's name and address must appear on each individual page of the nomination pages, making it clear who has certified those particular signatures, in the event of challenges.

As in *Florida Decides Healthcare Inc.*, such tasks do not appear to impact the First Amendment at all, much less trigger heightened scrutiny. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *4. And they do not acquire First Amendment protection just because they are combined with another activity that involves speech. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297–98 (1984).

That leaves the first circulator duty, attesting that he circulated the paper itself and obtained the signatures. As an initial matter, and as in *Florida Decides Healthcare*, this requirement does not prevent a non-Wisconsinite from accompanying a qualified circulator as she hands out nomination papers to sign, and speaking about their own views on the candidate. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *4; (Kehoe Decl. ¶ 28). But even if the non-circulator has some limitations because a qualified circulator must accompany him, candidates still experience no severe burden on ballot access because almost every Wisconsin adult can be a circulator.

For purposes of measuring whether a state regulation creates a severe burden, *Buckley* treated a State's adult population as the baseline, and then subtracted the members of the population who could not serve. *See Buckley*, 525 U.S. at 194–95. Unlike in *Buckley*, where Colorado's voter registration requirement reduced the number of eligible circulators from the total adult Colorado population by 400,000 people, Act 126's provisions includes the entire adult population to serve, so long as they have not been adjudged incompetent, not lived 28 days at an address, or are serving a felony criminal sentence. *See* Wis. Stat. § 6.03 (disqualifications to vote); (Dkt. 1-1:21).

Wisconsin's regulation is thus like the one upheld in *Jaeger*, where the court held that no heightened scrutiny was appropriate where the adult population remained available to serve as circulators. And it is unlike the state regulations rejected by courts where stringent local residence, voting registration, or party affiliation requirements created substantial burdens by dramatically reducing the pool of eligible people.

In a citizen initiative setting, depending on the facts, a plaintiff might show that even residency or voting eligibility poses significant burdens because of the large number of signatures needed. *See, e.g.*, *Yes On Term Limits, Inc.*, 550 F.3d at 1026. But for state or local candidate nomination papers, requiring at most a few thousand signatures, such hurdles are unlikely, and Plaintiff presents no such facts here. Plaintiff takes a different tack, announcing that

the law is *per se* unconstitutional if it cannot work with out-of-state circulator firms, (Dkt. 6-1:13, 15), but no court has created such a rule. Even in the context of initiative petition circulators, *Buckley* made clear that a court must first find a severe burden. Here, Plaintiff shows none caused by Act 126.

And Plaintiff's citations to cases involving presidential candidacies do not assist it. The standards there are different because the winners govern the entire nation. There is no presidential election this year, and Act 126 does not apply to presidential candidates, in any case.

Act 126's eligibility-to-vote requirement does not severely burden speech and thus is not subject to heightened scrutiny.

**2. Even if Act 126's provisions were subject to heightened scrutiny, Wisconsin has compelling interests and Act 126 is narrowly tailored to address them.**

Even if Act 126's provisions were subject to special scrutiny, the law has compelling interests and is narrowly tailored to address them.

Courts have recognized that deterring fraud and ensuring the integrity of the election process are compelling interests that justify regulation of candidate elections. *Republican Party of Penn. v. Degraffenreid*, 141 S. Ct. 732, 736 (2021); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The State's interest in preserving electoral integrity extends "to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote in the State," and "to

promoting transparency and accountability in the electoral process." *John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010). Here, requiring candidate circulators for nomination papers and recall petitions to be eligible to vote in Wisconsin ensures that they can be swiftly summoned as witnesses in fast-moving ballot challenges, and they can be held criminally accountable under Wisconsin's law governing such conduct.

Wisconsin's ballot access challenge process takes place on extremely compressed timeframes: this year, nomination papers must be filed by June 1, 2026, challenges must be made by June 4, 2026, and those challenges must be decided by June 10, 2026. Wis. Stat. § 9.10(3)(b), (4)(a); Wis. Admin. Code EL §§ 2.07(3), (3)(b), (j), (7); (*see also* Kehoe Decl. ¶¶ 30, 34).

The facts to which the qualified circulator attests are the facts at issue in a typical ballot access challenge: the voter's understanding of her signature, whether she lives in the relevant district, whether she is eligible to vote. Wis. Stat. § 8.15(4)(a). The circulator's personal knowledge and immediate availability are critical to assessing a ballot challenge. Requiring the circulator to be a Wisconsin elector ensures that he can quickly appear in person to clarify ambiguities in the papers, speak to accusations of fraud, and address other questions relating to a challenge.

Further, the State's criminal penalties applicable to circulator misconduct—Wis. Stat. § 12.13—have teeth only if the State can hale the

person before a court. This is the same compelling interest cited by the court in *Kean*, 56 F. Supp. 2d at 732. In 2026, the Commission found probable cause to believe that multiple circulators from out-of-state had violated that law, including prohibiting falsifying or fraudulently defacing or destroying a recall petition; credible evidence had been presented that listed voters had not actually signed a petition. The Commission made a referral to the Racine County District Attorney. (Kehoe Decl. ¶¶ 49–50, Ex. C.) But for those who do not reside in Wisconsin, they cannot be prosecuted in Wisconsin without extradition. Requiring circulators to be Wisconsin electors ensures that they are meaningfully accountable under that law if they engage in fraudulent election activity.

The law is also narrowly tailored. Any eligible voter in the State can serve, which furthers immediate availability and amenability to criminal prosecution, if needed. The law does not require any local residence and excludes presidential elections and referenda.

Plaintiff points to *Frami*, where Wisconsin failed to demonstrate compelling interests for a law requiring circulators to come from a specific election district. (Dkt. 6-1:18). But the law was different and the interests discussed (requiring a candidate to make a showing of local support, or have elections controlled by local voters) were different. *Frami*, 255 F. Supp. 2d at 968–69. The State did raise a concern about achieving the circulator's

presence for investigating a signature's validity, but the court's response supports a requirement of voter eligibility—it pointed out that the State's subpoena powers extended to people anywhere in Wisconsin. *Id.* at 969. And while the district court suggested that the Supreme Court saw fraud as less of a concern at the nomination stage than at the election, *id.* at 970, the Supreme Court has since reinforced that States have compelling interest in election integrity and deterring fraud at the signature gathering phase. *John Doe No. 1*, 561 U.S. at 233.

## II. Plaintiff fails to show that it will suffer irreparable harm absent an injunction.

Plaintiff's motion should also be denied because it has failed to show that it will suffer irreparable harm absent a preliminary injunction. Plaintiff bears the burden to show that such extraordinary relief is warranted. *Courthouse News Serv.*, 908 F.3d at 1068.

Plaintiff alleges *no* factual harm to any candidate relating to the upcoming election—not a single candidate that it would support but cannot get over the nomination hurdle. It complains that it wants to contract with a Michigan professional circulator, but it fails to show that no Wisconsin professional circulator could provide that service. (Dkt. 6-1:18.) Plaintiff relies instead on a presumption of irreparability based on the fact this is a First Amendment case, but it overreads that principle.

The presumption of irreparable harm applies only where the challenged restriction directly limits the plaintiff's speech. Where, a plaintiff alleges other types of First Amendment injury, it must "articulate a 'specific present objective harm or a threat of specific future harm.'" *Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 331 F.3d 342, 350 (2d Cir. 2003) (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)).

*Citizens United v. Schneiderman*, 115 F. Supp. 3d 457 (S.D.N.Y. 2015), a First Amendment campaign finance challenge, illustrates the point. There, the court concluded that the potential associational harms relating to their anonymous donors did not trigger any presumption of irreparable harm, and that the plaintiffs failed to prove an objective, immediate harm. *Id.* at 473–74.

Here, Plaintiff is not entitled to a presumption of irreparable harm, and it makes no effort to articulate an objective, immediate harm. No court has treated a desire to contract with a particular professional circulator as a constitutional right. (Dkt. 6-5:3.) Plaintiff offers no evidence that it cannot speak, find circulators in Wisconsin to support candidates who will fight non-citizens voting, if they believe that is a problem or identify a candidate that it can no longer support.

Because Plaintiff has failed to show irreparable harm, its motion for a preliminary injunction must be denied.

## III. The balance of harms and equities weighs against granting the injunction.

Plaintiff also fails to establish that the balance of equities, the public interest, or balancing of harms favor granting an injunction here. The Court must balance the generalized harm asserted by Plaintiff against the real, concrete irreparable harm to the State and the public if an injunction is granted. And Plaintiff's delay in bringing this case also weighs against it.

Plaintiff is wrong in asserting that there is no harm to the State and the public. (Dkt. 6-1:21.) *First*, the Supreme Court has explained the serious problems associated with modifying election procedures this close to elections: "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. Indeed, even "seemingly innocuous late-in-the-day" changes can "interfere with administration of an election and cause unanticipated consequences." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring).

An injunction here would feature those very problems. Candidates have been collecting signatures since April 15, 2026, complying with current state law. If that law were enjoined, there would be two standards under which signatures would be reviewed: those completed under the law, and those completed outside of it. For ballot challenges, election officials and opposing

candidates will have to utilize different standards for two different time periods, all on the statutorily compressed time period.

*Second*, a state suffers irreparable injury whenever its validly enacted laws are enjoined. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *R.R. Comm'n of Ala. v. Cent. of Ga. Ry. Co.*, 170 F. 225, 233 (5th Cir. 1909) ("the public has an interest in the enforcement of every law until it is repealed or judicially annulled").

*Third*, Plaintiff's unnecessary delay in bringing this motion further tips the balance of equities against the issuance of a preliminary injunction. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *See Benisek*, 585 U.S. at 159. Here, the challenged statute was enacted on March 27, 2026. But Plaintiff waited until April 29, 2026, to seek relief—over four weeks later. Given the tight timeline for the election sequence, from signature collection, ballot challenges, candidate finalization, ballot preparation, and ballot mailing, that wait was unreasonable.

## CONCLUSION

This Court should deny Plaintiff's motion for a temporary restraining order or preliminary injunction.

Dated this 8th day of May 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## CERTIFICATE OF SERVICE

I certify that on May 8, 2026, I electronically filed the foregoing Defendants' Brief in Opposition to Motion for Temporary Restraining Order or Preliminary Injunction with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 8th day of May 2026.

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**AMERICANS FOR CITIZEN VOTING PAC,**
**Plaintiff,**

**v.** **Case No. 26-CV-786**

**MEAGAN WOLFE, et al.,**
**Defendants.**

---

**AMENDED OPINION**

## I. BACKGROUND

Wisconsin requires candidates seeking nomination for political office to collect a certain number of signatures to appear on the ballot. *See* Wis. Admin. Code EL § 2.05. Signatures may be collected by a "qualified circulator." Until recently, a "qualified circulator" could be either a "qualified elector of this state" *or* someone who would be a qualified elector "if he or she were a resident" of Wisconsin. 2005 Wisconsin Act 451. On March 27, 2026, Governor Tony Evers signed into law 2025 Wisconsin Act 126 ("Act 126"), which struck the latter clause. In other words, circulators in Wisconsin must now be eligible to vote in Wisconsin and, therefore, must be residents of the state of Wisconsin.[1]

Plaintiff Americans for Citizen Voting ("ACV"), a Political Action Group, sued the Administrator and Commissioners of the Wisconsin Elections Commission, all in their official capacities, claiming this law violates the First and Fourteenth Amendments.

---

[1] This provision does not apply to nomination papers prepared for presidential and vice-presidential candidacies.

Specifically, ACV alleges that it "wants to support and associate with candidates for public office" that support its mission to "promote election integrity" by working with out of state-residents to collect nomination signatures. Compl. ¶¶ 11–14. Act 126's prohibition on doing so infringes on its First Amendment right to association, it says. ACV now moves for an emergency order temporarily restraining Act 126.

## II. ANALYSIS

Courts generally apply the same framework in analyzing temporary restraining orders and preliminary injunctions. *Kinetec USA, Inc. v. Medenvision BV, et al.*, Case No. 26-cv-442, 2026 WL 1179960 at *1 (E.D. Wis. Apr. 30, 2026). To obtain a preliminary injunction, the plaintiff bears the burden of first demonstrating that (1) it would suffer irreparable harm absent the relief, (2) traditional legal remedies would be inadequate, and (3) it has some likelihood of prevailing on the merits of its claims. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). After such a showing is made, the court "proceeds to a balancing analysis," weighing the harm to the plaintiff of denying the temporary restraining order against the harm to the defendant of granting it. *Id*.

Candidates began collecting signatures for the November 2026 election on April 15, 2026, after Act 126 went into effect. The window to obtain the necessary number of signatures closes on June 1, 2026. ACV argues that, absent a temporary restraining order, it will be irreparably and permanently harmed because it will not be able to participate in circulation efforts for this election cycle. Indeed, "the loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (internal citations omitted). Because

the alleged harm is the ability to participate in circulation for signatures, traditional legal remedies are clearly inadequate.

ACV avers that it has also sufficiently demonstrated a likelihood of success on the merits. Specifically, it points to a decision by the United States District Court for the Western District of Wisconsin invalidating a similar Wisconsin law over two decades ago. *Frami v. Ponto*, 255 F.Supp.2d 962 (W.D. Wis. 2003). That decision was based upon the Seventh Circuit's rejection of a nearly identical Illinois law. *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000). According to the ACV, these two cases alone are enough to conclusively establish that Act 126 violates the First Amendment and must therefore be struck down. Defendants, however, contend that those cases are distinguishable because the laws in question required circulators to be residents of and registered to vote in the political subdivision where candidates sought election, rather than merely residents of the state as a whole.

In any case, I need not decide this issue now because, even assuming ACV has demonstrated a likelihood of success, I find that the balance of equities weighs in favor of preserving the status quo. "An injunction is an equitable remedy, and such relief may be inequitable if it is issued shortly before an election, when candidates, election officials, and voters have relied on the rules in place at that time." *Malliotakis v. Williams*, 607 U.S. ---, 146 S.Ct. 809, 811 (2026) (Alito, J., concurring). The Supreme Court "has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election." *Merrill v. Milligan*, 142 S.Ct. 879, 880 (Kavanaugh, J., concurring).

The elections at issue in this case will not take place for many months. However, the process that ACV is challenging is ongoing. Defendants filed a sworn declaration by

Robert Kehoe, Deputy Administrator to the Wisconsin Elections Commission. ECF No. 15. In it, Kehoe explains that the circulation period for nominations for the 2026 fall elections has been underway for several weeks. Kehoe Decl. ¶ 15. Nomination papers including signatures must be received by June 1, 2026 or 72 hours after under certain circumstances. *Id.* ¶ 16. Challenges to nomination papers must be made by the third calendar day after the filing deadline, or June 4, 2026, to the respective state or county election officials. *Id.* ¶¶ 30–31. Those challenges must be decided by June 10, 2026. ¶ 34. Accordingly, we are in a tight timeframe, and I agree with Deputy Administrator Kehoe that changing the rules now could create significant confusion among circulators, candidates, people wishing to file challenges, and election administrators themselves.

ACV proposes deadline extensions to deal with the compressed timeline. But extending deadlines is unworkable. In addition to the deadlines above, ballots for the Partisan Primary Election must be printed and delivered to each municipal clerk in each county by June 24, 2026, who must then send absentee ballots. Kehoe Decl. ¶ 42. Some of those ballots must be sent abroad to military and overseas voters. *Id*. A change to one deadline would necessarily affect the others. The cascading effects would at a minimum be unwieldy if not much worse.

Furthermore, although the Act went into effect on March 27, 2026, ACV did not file this suit until April 29, 2026, over one month later and two weeks after the circulation period began. "[I]n election law cases as elsewhere," "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Unnecessary delays may be considered when a court balances the equities in determining whether to grant a preliminary injunction. *Id*. at 160.

My decision to preserve the status quo could be read as an invocation of the *Purcell* principle. *See Purcell v. Gonzalez*. 549 U.S. 1 (2006) (*per curiam*). ACV argues that cases affecting first amendment rights—particularly "[a]nti-speech laws" are not affected by *Purcell*. But this is not true. More than one district court has refused to issue a preliminary injunction based on the *Purcell* principle, despite finding that the contested laws implicate—and likely violate—First Amendment free speech principles. *See In re Georgia Senate Bill 202*, 622 F.Supp.3d 1312, 1342–1346 (N.D. Ga. 2022); *West v. Pa. Dep't of State*, 753 F.Supp.3d 424, 431 (W.D Pa. 2024).

Moreover, there is no reason to believe the *Purcell* principle applies differently when the election law impacts First Amendment speech rights rather than First Amendment voting rights or any other federal right. Election regulations "often will directly or otherwise burden core political speech and associational rights." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 206 (Thomas, J., concurring). In fact, the Supreme Court has expressly recognized that although it is "the unusual case" for a court not to enjoin unconstitutional laws, "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

ACV cites two cases arguing that *Purcell* applies only to laws affecting election "processes or machinery." *See Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 368 (9th Cir. 2016); *Am. Encore v. Fontes*, 152 F.4th 1097, 1121 (9th Cir. 2025). But the recent Supreme Court *Purcell* decisions I am bound by focus on the potential for "disruption" and "unanticipated and unfair consequences for candidate, political parties,

and voters, among others," *Milligan*, 142 S. Ct. at 881, not "processes or machinery," *Feldman*, 843 F.3d at 368.

To be clear, the *Purcell* principle is not a hard-and-fast rule. The Supreme Court has intimated that the *Purcell* principle might "be overcome" when

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Milligan*, 142 S.Ct. at 881. ACV meets almost none of these factors. First, it is not clear that the underlying merits "are entirely clear cut." Defendants raise at least an arguable point that there is a significant distinction between the laws that were previously found unconstitutional in Wisconsin and Illinois and the one ACV challenges now. Second, I am concerned by plaintiff's timeline for bringing the suit. Finally, I have already explained why the proposed change would create significant confusion and hardship to the nomination process that is already in motion.

With that said, I am not issuing a ruling today on whether the law is, in fact, unconstitutional, and I reserve judgment on the issue. I only find that granting the temporary restraining order would go against the balance of equities. Nonetheless, I find that additional briefing is warranted to resolve the motion for a preliminary injunction. I will order a scheduling conference to discuss a full briefing schedule. The parties should also be prepared to discuss whether an evidentiary hearing is warranted.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiff's motion for a temporary restraining order (ECF No. 6) is **DENIED**.

**IT IS FURTHER ORDERED** that a telephonic scheduling conference is scheduled for **May 14, 2026, at 3:00 p.m.** The parties should be prepared to discuss what, if any, additional briefing is needed, a proposed schedule for such briefing, and the potential need for the Court to hold an evidentiary hearing. The parties may, but are not required to, submit a joint letter proposing a schedule by May 14, 2026, at 10:00 a.m. The parties shall call the Court's Zoom conference line at 669-254-5252 and use Meeting ID 161 8470 1401 and Passcode 187773 to join the call and may be placed on hold until the Court accesses the call. Parties should call in prior to the time that the hearing is scheduled to begin so that there is no disruption to the court proceeding. *The participation of the attorney who will be handling the case is required and their telephone number should be provided by email to AdelmanPO@wied.uscourts.gov*.

Dated at Milwaukee, Wisconsin, this 13th day of May, 2026.

**s/Lynn Adelman**
LYNN ADELMAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

AMERICANS FOR CITIZEN VOTING PAC,

*Plaintiff*,

v.

MEAGAN WOLFE, ANN S. JACOBS, MARK L. THOMSEN, CARRIE RIEPL, DON M. MILLIS, ROBERT F. SPINDELL, JR., *and*, MARGE BOSTELMANN, *in their official capacities as Wisconsin Elections Commissioners*,

*Defendants*.

Case No. 2:26-cv-786

---

**THE WISCONSIN STATE LEGISLATURE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE**

---

## INTRODUCTION

The Wisconsin State Legislature ("Legislature") is entitled to intervene as a matter of right in this challenge to the validity of 2025 Wisconsin Act 126 ("Act 126") (codified at Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3), 8.40(2), and 9.10(2)(em)2.), because the Legislature satisfies all four elements of Federal Rule of Civil Procedure 24(a)(2), as further developed in the legislative-intervention context by the Supreme Court in its recent decision of *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022). As *Berger* held, States possess the "prerogative to select which agents may defend its laws and protect [these] interests" in federal court, 597 U.S. at 197, and, here, Wisconsin has "authorize[d] its [L]egislature to litigate on the

State's behalf," *id.* at 192 (citation modified), in federal court in the defense of the constitutionality of its laws, *see* Wis. Stat. § 803.09(2m); *see also id.* § 13.365. Accordingly, the Legislature has an interest in this action, sufficient for intervention, as the duly authorized "agent[ ]" of Wisconsin to defend State law in court. *Berger*, 597 U.S. at 197. The Legislature also has its own unique interest for purposes of intervention in defending its own constitutional powers, including its power to enact laws generally, *see* Wis. Const. art. IV, § 1, and in the election context specifically, *see* Wis. Const. art. III, § 2; Wis. Const. art. XIII, § 12(7). Further, as *Berger* makes clear, no other party can adequately represent the Legislature's interests—including Defendants, who are individual members of the Wisconsin Elections Commission, sued in their official capacities (collectively, "WEC")—given Wisconsin's sovereign choice to "select" the Legislature as its "agent[ ]" to "defend it laws and protect its interest." *Berger*, 597 U.S. at 197–98; *accord Liebert v. WEC*, 345 F.R.D. 169, 172 (W.D. Wis. 2023) (granting the Legislature's motion to intervene in a case involving WEC as defendant). Alternatively, this Court should exercise its discretion to grant the Legislature permissive intervention under Rule 24(b), including to further the interests of federal-State comity and to recognize the "sovereign choice" of the "people of [Wisconsin]." *Berger*, 597 U.S. at 200.

Counsel for the Legislature has conferred with counsel for Plaintiff and counsel for WEC on this Motion. Counsel for Plaintiff has stated that it opposes the Legislature's Motion at this point but reserves the right to change that position after

seeing the Legislature's intervention filing. Counsel for WEC has stated that it opposes the Legislature's Motion.

This Court should grant the Legislature's Motion To Intervene.

## INTEREST OF PROPOSED INTERVENOR

Plaintiff's lawsuit challenges a Wisconsin law that requires the circulators of nomination papers and recall petitions in Wisconsin to be "qualified [Wisconsin] electors"—which includes being a Wisconsin resident. *See* 2025 Wis. Act 126; Dkt.1-1 at 17.[1] This challenge directly implicates the Legislature's sovereign interests in two respects.

First, Plaintiff's lawsuit threatens the Legislature's interests in the enforcement of the requirement that circulators of nomination papers and recall petitions in Wisconsin be "qualified electors" and, thus, Wisconsin residents. As the Supreme Court stated in *Berger*, "States possess a legitimate interest in the continued enforce[ment] of [their] own statutes." 597 U.S. at 191 (citations omitted). Therefore, States "must be able to designate agents to represent [them] in federal court" to protect this interest "and may authorize [their] legislature[s] to litigate on the State's behalf, either generally or in a defined set of cases"—with that "choice belong[ing] to the sovereign State." *Id.* at 192 (internal quotations and citations omitted). Accordingly, where a lawsuit attacks the validity of a State's law and the State's duly authorized representative seeks to intervene in that lawsuit to defend that law, "federal courts should rarely question that [the] State's interests will be

[1] "Dkt." citation pincites are to the ECF-generated pagination in the document.

practically impaired or impeded if its duly authorized representatives are excluded from participating in [the] federal litigation challenging [the] state law." *Id.* at 191.

Consistent with *Berger*, Wisconsin law designates the Legislature—the body "vested" with the "legislative power" of the State, Wis. Const. art. IV, § 1—as an agent that may litigate on the State's behalf in defense of the State's interests in the validity of the State's laws, *see Berger*, 597 U.S. at 191–92. Section 803.09(2m) of the Wisconsin Statutes specifies that, "[w]hen a party to an action challenges . . . the constitutionality of a statute, facially or as applied . . . *the legislature* may intervene as set forth under [Section] 13.365." Wis. Stat. § 803.09(2m) (emphasis added); *see Berger*, 597 U.S. at 191–92. The Wisconsin Supreme Court specifically addressed the Legislature's intervention in federal court in a certified question from the Seventh Circuit, interpreting Section 803.09(2m) and determining that the Legislature is permitted to intervene where, like here, a party "otherwise challenges the . . . validity of a statute, as part of a claim or affirmative defense." *Democratic Nat'l Comm. v. Bostelmann*, 949 N.W.2d 423, 426 (Wis. 2020) (quoting Wis. Stat. § 803.09(2m)); *see Berger*, 597 U.S. at 191–92. After the Wisconsin Supreme Court provided that answer to the certified question, the Seventh Circuit granted the Legislature's intervention to defend the challenged Wisconsin laws in the case before it. *See Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020).

Second, Plaintiff's lawsuit also directly implicates the Legislature's interest in its own constitutional powers, which is an additional interest that is separate and distinct from the enforcement-of-state-law interest recognized most recently in

*Berger*. *See Wis. Legislature v. Palm*, 942 N.W.2d 900, 908 (Wis. 2020); *Serv. Emps. Int'l Union, Loc. 1 ("SEIU") v. Vos*, 946 N.W.2d 35, 54–57 (Wis. 2020), *overruled in part on other grounds by Evers v. Marklein*, 22 N.W.3d 789 (Wis. 2025). Wisconsin's Constitution vests the legislative power in the Legislature, which may "[e]nact . . . laws." Wis. Const. art. IV, § 17. This legislative power extends to the power to pass election laws specifically. *See* Wis. Const. art. III, § 2, *see also* 2025 Wis. Act 126, Wis. Stat. § 8.15(4)(a); Wis. Const. art. XII, § 12(7). Thus, it is a "rule" "that legislation on the subject of elections is within the constitutional power of the legislature." *League of Women Voters of Wis. Educ. Network, Inc. v. Walker*, 834 N.W.2d 393, 412 (Wis. Ct. App. 2013) (citation omitted). For this reason, the Legislature has a core interest in defending against claims, such as Plaintiff's claims here, that threaten to undermine the efficacy and integrity of the Legislature's constitutional authority to enact laws governing the parameters of the nomination-petition and recall processes. *See Palm*, 942 N.W.2d at 908.

## STATEMENT

### A. Legal Background

The Legislature has enacted multiple statutory provisions governing the process for nominating candidates for elective office in the State and determining how they may obtain access to the ballot. *See generally* Wis. Stat. §§ 8.01 *et seq*. As WEC[2] has explained, these statutory provisions require candidates to, among other things,

[2] Wis. Stat. § 8.07 charges WEC with the duty to "promulgate rules under this chapter for use by election officials in determining the validity of nomination papers and signatures thereon."

submit "four primary documents" by a set deadline prior to an election in order "to gain a place on the ballot." *See* WEC, *Candidate Ballot Access Procedures: Nomination Papers* at 3 (Oct. 2023);[3] Wis. Stat. §§ 8.15, 8.16.

As particularly relevant here, the documents that a candidate must submit to obtain access to the ballot include nomination papers, which a candidate completes by "circulat[ing] signature petitions and collect[ing] a specific number of signatures, as required by law, from qualified electors residing in the jurisdiction or district [the candidates] wish to serve." WEC, *Candidate Ballot Access Procedures*, *supra*, at 3; *see* Wis. Stat. §§ 8.15, 8.16. The minimum number of required signatures for nomination papers varies from 200 to 4,000, depending on the level of office for which a candidate is seeking to run (*i.e.*, municipal, State, or federal, and district-specific or statewide). *See* Wis. Stat. §§ 8.15, 8.16. The period of circulation to collect those signatures spans either from December 1 to the first Tuesday in January, for spring elections, or from April 15 to June 1, for fall elections. *See* WEC, *Candidate Ballot Access Procedures, supra*, at 3–4 (citing Wis. Stat. §§ 8.10(2), (3), 8.15(6)). The qualified electors who sign a candidate's nomination papers must "complete their portion of the nomination papers by providing their signature, printed name, residential address, municipality of residence, and the date on which they signed." *Id.* at 6. The "circulator"—"the person responsible for [the nomination papers'] circulation"—must "closely observe the signing process to ensure that each elector

[3] Available at https://elections.wi.gov/sites/default/files/documents/Ballot%20Access%20Manual%20Oct%202023.pdf. (all webpages last accessed May 13, 2026).

correctly provides all required information," must personally circulate the papers, must personally witness each qualified elector's signature, and must sign and "complete a certification for each page they circulate." *Id.* at 6–7; *see* Wis. Stat. § 8.15(4)(a). The circulator's certification requires the circulator to provide his or her name; address (including the street number, street name, and municipality); the date on which the page was completed; and signature. WEC, *Candidate Ballot Access Procedures*, *supra*, at 6.

Candidates do not have to circulate their own nomination papers themselves; instead, they may use a "qualified circulator" to collect signatures on their behalf. *See id.* at 6–7; Wis. Stat. § 8.15(4)(a). In 2001, the Legislature had enacted the prior version of Wis. Stat. § 8.15(4)(a) to provide that a "qualified circulator" of a nomination paper must "reside[ ] within the district which the candidate named therein will represent, if elected" and must be either "the candidate or any qualified elector." Wis. Stat. § 8.15(4)(a) (2001). In 2003, the U.S. District Court for the Western District of Wisconsin held that the version of Wis. Stat. § 8.15(4)(a) at issue there violated the First Amendment "to the extent it prevents Wisconsin residents from circulating nomination papers outside the political subdivision in which they reside and to the extent it prevents persons who reside outside of Wisconsin from circulating nomination papers on behalf of Wisconsin candidates." *Frami v. Ponto*, 255 F. Supp. 2d 962, 971 (W.D. Wis. 2003). The Legislature then amended Wis. Stat. § 8.15(4)(a) (2001) with 2005 Wisconsin Act 451, "remov[ing] the residency requirement by providing that a circulator of a nomination paper or petition must be

a qualified elector of this state or a U.S. citizen age 18 or over who, if he or she were a resident of the state, would not [otherwise] be disqualified from voting." 2005 Wis. Act 451.

Following this change in the law, Wisconsin experienced increased fraud with circulators, particularly circulators who were out-of-state residents. In 2024, Wisconsin experienced out-of-state election fraud during a recent recall attempt of Wisconsin Assembly Speaker Robin Vos. Dkt.15 at ¶¶ 46–50. During that recall attempt, "[r]oughly two-thirds of the individuals who circulated recall petitions were from out of state," and these collection efforts yielded "allegedly forged signatures" and "duplicate and questionable signatures." Rep. Jim Piwowarczyk, *Testimony Before The Assembly Comm. On Campaign And Elections* (June 3, 2025).[4] WEC received a verified complaint related to that recall attempt and ultimately found probable cause that multiple out-of-state circulators had falsified signatures on the recall petitions they had circulated or falsified their residential addresses. WEC referred the matter for criminal prosecution in early 2026. WEC, *Letter Re: Robin Vos v. Matthew Snorek et al (EL-2450)* (Feb. 27, 2026);[5] *see also* Dkt.15-3.

This prompted the Legislature to again amend Wisconsin's circulator-qualification law, now to its current form, in 2026 with Act 126. Act 126 amends

---

[4] Available at https://docs.legis.wisconsin.gov/misc/lc/hearing_testimony_and_materials/2025/ab223/ab0223_2025_06_03.pdf.

[5] *See* J.R. Ross, Elections Commission Recommends Charges Against 13 Involved In Failed Vos Recall, State Affairs, (Feb. 27, 2026), available at https://pro.stateaffairs.com/wi/news/elections-commission-recommends-charges-against-13-involved-in-failed-vos-recall (linking to letter).

several statutory provisions governing the candidate-nomination process to now require any qualified circulator to be "a qualified elector of this state," *see* 2025 Wis. Act 126; Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3), and to certify as such with a certificate attached to any nomination paper that the circulator is submitting, Wis. Stat. §§ 8.10(3), 8.15(4)(a), 8.20(3). Under existing Wisconsin law, a "qualified elector" is any "U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote." Wis. Stat. § 6.02(1). To be "qualified elector," an individual need not actually be registered to vote. *See id.*; *Frami*, 255 F. Supp. 2d at 965. Act 126 extends its requirements to circulators of "a recall petition" as well, Wis. Stat. §§ 8.40(2)(a)–(b); Wis. Stat. § 9.10, but does not apply to circulators of other petitions, such as recount petitions, *see* Wis. Stat. § 9.01; 2025 Wis. Act 126. Act 126 also does not apply to circulators of nomination papers "for candidates for the offices of president and vice president." Wis. Stat. § 8.20(3); 2025 Wis. Act 126. Finally, any nomination papers submitted by a "[non-]qualified elector" for applicable nominations or petitions is deemed invalid. *Id.* § 9.10(2)(em)2. Act 126 was published on March 28, 2026, *see* 2025 Wis. Act 126,[6] and took effect on March 29, 2026, Act Memo, Wis. Legislative Counsel (Mar. 30, 2026).[7]

[6] Available at https://docs.legis.wisconsin.gov/2025/related/acts/126.

[7] Available at https://docs.legis.wisconsin.gov/2025/related/lcactmemo/act126.pdf.

### B. Factual And Procedural Background

Wisconsin has a partisan primary election on August 11, 2026, and a general election on November 3, 2026. *See* Dkt.15 at 3. The period for circulators to obtain nomination signatures on behalf of candidates seeking to gain access to the ballots for these elections began on April 15, 2026, and will end on June 1, 2026. *See id.* at 4; *see also* Wis. Admin. Code EL § 2.05. Given Act 126's March 29, 2026 effective date, Act 126's definition of a "qualified circulator" applies to the circulators for the current, ongoing circulation period. *See* 2025 Wis. Act 126.

On April 29, 2026—during the current circulation period—Plaintiff filed its Complaint in the Wisconsin Circuit Court for Waukesha County, challenging Act 126 as a violation of the First Amendment (as incorporated against the States by the Fourteenth Amendment). Dkt.1-1 at 10–18. Plaintiff named as defendants WEC's Administrator and Commissioners, in their official capacities. *See id.* Plaintiff's Complaint alleges that Plaintiff "wants to work with out-of-state residents seeking to collect nomination signatures in Wisconsin," but that it is unable to do so because of Act 126. *Id.* at 12. Accordingly, Plaintiff claims, Act 126's "residency requirements" for circulators violate the First Amendment by "unlawfully restrict[ing] core political speech and associational rights." *Id.* at 11. Plaintiff's Complaint requests "immediate temporary relief" *id.* at 12, as well as permanent relief, declaring Act 126's residency requirements unconstitutional and enjoining Defendants from enforcing those requirements, *id.* at 17–18. On May 4, 2026, Defendants filed a Notice Of Removal, removing the case to this Court. Dkt.1. Then, on the same day, Plaintiff filed a Motion For Temporary Restraining Order and a Motion For

Preliminary Injunction. Dkt.6. On May 8, 2026—the deadline this Court had set for responses to Plaintiff's request for a temporary restraining order, Dkt.8—the Legislature filed a letter with the Court disclosing its intent to intervene and asking the Court to deny Plaintiff's request for a temporary restraining order and instead set an appropriate briefing schedule on Plaintiff's preliminary-injunction request, Dkt.13. Also on May 8, 2026, Defendants filed their Opposition To Plaintiff's Motion For Temporary Restraining Order Or Preliminary Injunction. Dkts.14, 15.

On May 12, 2026, the Court denied Plaintiff's Motion For Temporary Restraining Order, and scheduled a status conference on May 14, 2026 to determine the briefing schedule for Plaintiff's Motion For Preliminary Injunction. Dkt.17.

## ARGUMENT

### I. The Legislature Is Entitled To Intervene As A Matter Of Right Under Rule 24(a)(2)

Federal Rule of Civil Procedure 24(a)(2) provides that, "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Rule 24(a)(2) contains four elements for intervention as of right: "(1) the motion is timely; (2) the moving party has an interest relating to the property or transaction at issue in the litigation"; "(3) that interest may, as a practical matter, be impaired or impeded by disposition of the case"; and (4) the "existing parties" do not "adequately represent [the moving parties'] interests." *Driftless Area Land*

*Conservancy v. Huebsch*, 969 F.3d 742, 746 (7th Cir. 2020). The Legislature satisfies all these elements here.

1. *The Legislature's Motion Is Timely*. Courts "look to four considerations" when "evaluating [the] timeliness" of a motion to intervene: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; and (4) any other unusual circumstances." *Cook Cnty. v. Texas*, 37 F.4th 1335, 1341 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 565 (2023). The "most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 389–90 (7th Cir. 2019) (citation omitted). The Legislature's Motion is timely because the Legislature "move[d] promptly to intervene as soon as it kn[ew] . . . that its interests might be adversely affected" by this litigation and less than a month after Plaintiff filed its Complaint, with this lawsuit still in its early stages and with no responsive pleadings on file. *Cook Cnty.*, 37 F.4th at 1341 (citation omitted). Federal courts have held that similarly timed intervention motions were timely. *See, e.g.*, *Taylor v. Milwaukee Election Comm'n*, No.2:20cv545, 2020 U.S. Dist. LEXIS 83267, at *2–3 (E.D. Wis. May 12, 2020); *Hunter v. Bostelmann*, No.21-cv-512, 2021 WL 4592659, at *3 (W.D. Wis. Oct. 6, 2021) (five weeks); *Edwards v. Vos*, No.20-cv-340, 2020 WL 6741325, at *1 (W.D. Wis. June 23, 2020) (eight weeks); *Donald J. Trump for President, Inc. v. Northland Television, LLC*, No. 20-cv-385, 2020 WL 3425133, at *1

(W.D. Wis. June 23, 2020) (eight weeks); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. United States*, No.02-C-0553-C, 2002 WL 32350046, at *2 (W.D. Wis. Nov. 20, 2002) (more than two months). No party could plausibly claim prejudice from this Court granting the Legislature's intervention, whereas the Legislature itself would be substantially prejudiced if this Court were to exclude it as a party in light of its significant interests at stake.

2. *The Legislature Has An Interest In This Litigation*. Under Rule 24(a)(2), a proposed intervenor must "claim[ ] an interest relating to the property or transaction that is the subject of the action[.]" *Berger*, 597 U.S. at 190 (citation omitted). This interest must "be direct, significant, and legally protectable," but the Seventh Circuit has "interpreted statements of the Supreme Court as encouraging liberality in the definition of an interest." *Lopez-Aguilar*, 924 F.3d at 391–92 (citations omitted). The Seventh Circuit has interpreted "the term 'interest' [ ] to be broadly construed" in favor of intervention. *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982).

The Legislature here possesses two independently sufficient interests justifying its intervention as of right.

First, as the Supreme Court stated in *Berger*, States have "a legitimate interest in the continued enforce[ment] of [their] own statutes," 597 U.S. at 191 (citations omitted), and thus "a strong interest" in litigation "seek[ing] to attack a state law on the ground that it is inconsistent with the Federal Constitution," *id.* at 184. States may empower "duly authorized representatives" to "participat[e] in federal litigation

challenging state law" to protect that interest—"either generally or in a defined set of cases"—as determined by "the sovereign State." *Id.* at 191–92 (citations omitted). And, highlighting the importance of this interest, the Supreme Court has directed federal courts to "rarely question that a State's interests will be practically impaired or impeded if its duly authorized representatives are excluded from participating in federal litigation challenging [a] state law." *Id.* at 191.

Here, Plaintiff seeks an order declaring that Wisconsin's "qualified elector" residency requirement for circulators violates federal law, *supra* pp.5–11, which implicates Wisconsin's "strong" sovereign interest in the "continued enforceability of [its] own statutes"—including, as directly relevant here, the processes for candidate nominations and recall petitions, *Berger*, 597 U.S. at 184 (citation omitted); *see Hollingsworth v. Perry*, 570 U.S. 693, 709–10 (2013) (citation omitted); *Lopez-Aguilar*, 924 F.3d at 392. Wisconsin, like all States, possesses the "prerogative to select which agents may defend its laws and protect [these] interests," *Berger*, 597 U.S. at 197, and Sections 13.365 and 803.09(2m) demonstrate Wisconsin's sovereign choice to "authorize *its legislature* to litigate on the State's behalf" to defend the State's interests in State law. *Id.* at 192–93 (emphasis added) (citation omitted). So, "[w]hen a party to an action challenges . . . the constitutionality of a statute, facially or as applied . . . *the legislature* may intervene as set forth under [Section] 13.365." Wis. Stat. § 803.09(2m) (emphasis added). Thus, the Legislature unquestionably has an interest here, sufficient for mandatory intervention. *Berger*, 597 U.S. at 191–93; *see Bostelmann*, 949 N.W.2d at 426–28; *accord Bostelmann*, 977 F.3d at 641.

Second, the Legislature also has an independent interest in defending the efficacy and integrity of its own constitutional authority to make laws for the State of Wisconsin, *see Palm*, 942 N.W.2d at 908—which is the "authority over a State's most fundamental political processes," *Berger*, 597 U.S. at 192 (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)). The Wisconsin Constitution vests the legislative power in the Legislature, which may "[e]nact[ ] . . . laws", Wis. Const. art. IV, § 17, including election laws, *see* Wis. Const. art. III, § 2, *see also* Wis. Const. art. XIII, § 12(7); 2025 Wis. Act 126; Wis. Stat. 8.15(4)(a); *Walker*, 834 N.W.2d at 412. In particular, the Wisconsin Constitution provides that the Legislature "may" enact laws for "suffrage," Wis. Const. art. III, § 2, and the Legislature exercised that power in enacting Act 126's "qualified elector" requirements for the circulators of nomination papers and recall petitions, *see* 2025 Wis. Act 126; *accord Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196 (2008) (controlling plurality of Stevens, J.). Further, the Legislature has a particular interest here because the nomination-paper and recall-petition processes that Plaintiff challenges relate directly to the composition of the legislative body itself. *Accord Powell v. McCormack*, 395 U.S. 486, 548 (1969) ("Unquestionably, Congress has an interest in preserving its institutional integrity"). Plaintiff claims that Act 126's requirement that circulators be qualified Wisconsin electors and thus reside in Wisconsin violates federal law and, therefore, is unenforceable in Wisconsin for purposes of circulating nomination papers and recall petitions. *Supra* pp.10–11. That challenge directly implicates the Legislature's

strong interest in defending the effective use of its own constitutional powers, *see Palm*, 942 N.W.2d at 908, including especially its authority to enact laws governing "suffrage," Wis. Const. art. III, § 2.

3. *This Lawsuit Directly Impairs The Legislature's Interests*. The third element of intervention as of right under Rule 24(a)(2) is that the action "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." *Berger*, 597 U.S. at 190 (citation omitted). In this case, granting Plaintiff's request to invalidate Act 126's "qualified elector" residency requirement for circulators would directly impair both of the Legislature's interests, as noted above. Again, Wisconsin has a sovereign interest in defending the constitutionality of its own election laws, *Berger*, 597 U.S. at 190–91, and the State has designated the Legislature as its agent to defend this interest on behalf of the State in federal court, under *Berger*, *see* Wis. Stat. §§ 13.365, 803.09(2m); *supra* pp.3–5. Plaintiff's lawsuit here, if successful, would directly impair that interest by prohibiting the enforcement of Act 126's "qualified elector" residency requirement for circulators altogether. *See Berger*, 597 U.S. at 190–91; *accord Lopez-Aguilar*, 924 F.3d at 385. And, if Plaintiff were successful here, this would also impair the Legislature's interest in the efficacy and integrity of its own constitutional power to enact procedures governing the State's election-nomination and recall-petition processes for the same reason, as any relief for Plaintiff on its claim would thwart those powers. *See* Wis. Const. art. III, § 2.

4. *No Other Party Adequately Represents The Legislature's Interest*. The last requirement for intervention as of right under Rule 24(a)(2) is that no "existing defendant already 'adequately represent[s]' the same interests a proposed intervenor seeks to vindicate." *Berger*, 597 U.S. at 195 (citation omitted). Where a proposed intervenor's interest is "similar to, but not identical with, that of one of the parties," the proposed intervenor's burden in establishing that its interests are not adequately represented "should be treated as minimal," as the possession of similar interests alone "normally is not enough to trigger a presumption of adequate representation." *Id.* at 196–97 (citation omitted); *see Driftless Area Land Conservancy*, 969 F.3d at 748 ("[I]t's not enough that a defense-side intervenor 'shares the same goal' as the defendant in the brute sense that they both want the case dismissed."). The "rais[ing]" of "[d]ifferent defenses," for example—even where all parties are "mount[ing] a vigorous defense"—satisfies that minimal burden. *Driftless*, 969 F.3d at 749. Further, State entities often "may pursue 'related' state interests" in litigation without being "fairly presumed to bear 'identical' ones." *Berger*, 597 U.S. at 197 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 (1972)). Therefore, "a presumption of adequate representation is inappropriate when a duly authorized state agent seeks to intervene to defend a state law," and it is "*especially* inappropriate when wielded to displace a State's prerogative to select which agents may defend its laws and protect its interests." *Id.* at 197. Ultimately, "a State's chosen representatives should be greeted in federal court with respect, not adverse presumptions," and "duly designated state agents seeking to vindicate state law"

should only face "a 'minimal' burden" to establish inadequacy of representation rather than "some higher hurdle." *Id.* at 197–98.

Here, the Legislature exceeds its "'minimal' burden" to show that the existing parties do not adequately represent its interests—which "'minimal' burden" applies because the Legislature is one of Wisconsin's "duly designated state agents seeking to vindicate state law," *id.* at 198, and because its interests are "similar to, but not identical with, that of [Defendant WEC]," *id.* at 197 (citation omitted). As an initial matter, Plaintiff is obviously adverse to the Legislature's interests, in that it seeks to invalidate Act 126's "qualified elector" residency requirement for circulators, duly enacted by the Legislature pursuant to its State constitutional authority. *Supra* pp.3–5. Thus, Plaintiff cannot possibly represent the Legislature's interests.

Defendants—WEC's Administrator and its Commissioners—do not adequately represent the Legislature's interests either.

Under *Berger*, States have a sovereign right to choose their representatives in federal court, and any presumption of adequacy of *other* parties in the litigation is inappropriate. *See* 597 U.S. at 195–97. Here, Wisconsin has chosen the Legislature as its agent, Wis. Stat. § 803.09(2m), so this Court should respect that choice by granting the Legislature's intervention, regardless of WEC's own advocacy in this case. *See Berger*, 597 U.S. at 197–98. The Legislature has its own "tactical choice[s]" that "give voice to [its] different perspective" on the State's behalf, meaning that WEC's representation is not adequate to protect the Legislature's own interests. *Berger*, 597 U.S. at 198–99 ("[T]his litigation illustrates how divided state

governments sometimes warrant participation by multiple state officials in federal court."); *accord Driftless*, 969 F.3d at 748 ("[I]t's not enough that a defense-side intervenor 'shares the same goal' as the defendant in the brute sense that they both want the case dismissed.").

While *Berger*'s binding holding alone decides the adequacy-of-representation issue in favor of the Legislature's intervention as of right, the Legislature also satisfies the adequacy-of-representation element because WEC's representation is inadequate even beyond *Berger*'s minimal threshold. Most directly, the Legislature intends to "raise[ ]" "[d]ifferent defenses" here than WEC, which alone demonstrates WEC's inadequacy vis-à-vis the Legislature—without casting any doubt on whether WEC intends to "mount [its own] vigorous defense." *Driftless*, 969 F.3d at 749. Specifically, the Legislature intends to argue that the Seventh Circuit's recent decision in *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020), supplies the controlling articulation of the *Anderson/Burdick* framework applicable to Plaintiff's claim here. *Luft* requires "weigh[ing]" an alleged burden from an election law "against the state's interests" in the law and the burdens of "the whole electoral system." 963 F.3d at 671–72. Further, *Luft* holds that a State can "offset" the "more stringent" burdens from one election law with more "liberal" features of others. *Id.* at 671. So, to decide Plaintiff's claim here under *Luft*, the Court must consider Plaintiff's alleged burdens from Act 126 against Wisconsin's significant election-integrity interests in that provision and all of the more permissive features of Wisconsin's nomination-paper-circulation process—such as the reasonable number of signatures required, Wis. Stat.

§§ 8.15, 8.16, and the lack of a requirement that a circulator actually be registered to vote, *see id.* § 6.02(1); *Frami*, 255 F. Supp. 2d at 965. WEC, for its part, has not raised this *Luft*-based argument, as evidenced by its already filed Brief In Opposition To Motion For Temporary Restraining Order Or Preliminary Injunction. Dkt.14 (failing to cite *Luft*). Instead, WEC rests its defense largely upon pre-*Luft* decisions, such as *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000). *See* Dkt.14 at 10–28. That "[d]ifferent defenses have been raised" by WEC and the Legislature also decides the adequacy-of-representation element in the Legislature's favor. *Driftless*, 969 F.3d at 749.

The presence of different defenses raised by the WEC and the Legislature was key to Judge Peterson's grant of intervention as of right to the Legislature in *Liebert v. WEC*, 345 F.R.D. 169 (W.D. Wis. 2023). There, Judge Peterson explained that "[t]he legislature"—as proposed-intervenor-defendant—"identifi[ed] several issues it wishe[d] to raise that [WEC] ha[d] not raised." *Id.* at 172. Those "different issues raised by the legislature" demonstrated that WEC's representation of the Legislature's interest may be inadequate there, "just as in *Driftless*." *Id.*[8]

Finally, while also not necessary to decide the adequacy-of-representation element in the Legislature's favor, the Legislature respectfully notes that WEC has an inconsistent history of defending Wisconsin's election laws when named as a

[8] Judge Peterson also concluded in *Liebert* that, regardless of the intervention-as-of-right analysis, the Legislature deserves "permissive intervention . . . under Rule 24(b)" because the "other parties"—including WEC—"will [not] be unfairly prejudiced by the legislature's presence" and there were "significant differences" between the Legislature's and WEC's arguments. 345 F.R.D. at 172.

defendant in lawsuits challenging such laws. Sometimes WEC does not defend challenged election laws at all. For example, in cases challenging the validity of Wisconsin's redistricting maps, WEC has declined to defend those maps in any respect. *See, e.g.*, *Bothfeld v. WEC*, 27 N.W.3d 508 (Wis. 2025) (noting that WEC filed a statement of no position in response to a redistricting challenge). And in *Democratic National Committee v. Bostelmann*, No.3:20-cv-00249 (W.D. Wis. 2020), WEC declined to defend Wisconsin's challenged photo-ID law, disclosing without explanation that it was "unable to state a position on [the] issue," Defs' Resp. To Mot. For Preliminary Injunction & Reconsideration, *Democratic Nat'l Comm. v. Bostelmann*, No.3:20-cv-00249, Dkt.48 at 16 (W.D. Wis. Mar. 30, 2020); *accord Bostelmann*, 977 F.3d 639, 643–44 (7th Cir. 2020) (Rovner, J., dissenting) (noting that WEC "acceded" to parts of the district court's "injunction"). Other times, WEC does defend the challenged election laws at the trial court, but then does not pursue meritorious appeals. *See Disability Rts. Wis. v. WEC*, 20 N.W.3d 790, 793 (Wis. Ct. App. 2025) (successful preliminary-injunction appeal involving only the Legislature as intervenor, although WEC had participated below); *Rise, Inc. v. WEC*, 11 N.W.3d 241, 249 (Wis. Ct. App. 2024) (similar, with respect to partially successful summary-judgment appeal). The Legislature respectfully submits that WEC's inconsistent and inexplicable (or, at least, unexplained) practice in fully defending Wisconsin's election laws also shows that WEC's representation may be inadequate to protect the Legislature's interests here.

## II. Alternatively, This Court Should Grant The Legislature Permissive Intervention Under Rule 24(b)(1)(B)

If the Court disagrees that the Legislature can intervene as of right, then the Legislature respectfully requests that the Court exercise its discretion to grant permissive intervention under Rule 24(b)(1)(B), including when the Legislature "has . . . reserved to itself some authority to defend state law on behalf of the State." *Berger*, 597 U.S. at 194.

*First*, the Legislature satisfies the only two requirements for permissive intervention: the Legislature "timely" filed its intervention motion and "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). As explained above, the Legislature's motion is timely. *Supra* pp.12–13. Further, the Legislature has filed an attached proposed Answer raising defenses to the claims in Plaintiff's Complaint and so "shares [a question of law] with the main action." Fed. R. Civ. P. 24(b)(1). The Legislature also intends to file an Opposition to Plaintiff's Motion For Preliminary Injunction according to whatever schedule this Court sets. *See* Dkt.17.

The Legislature also satisfies other applicable permissive-intervention factors as well. The district court has a "wholly discretionary" determination to consider other factors, *see Liebert*, 345 F.R.D. at 172, including factors such as federal-state comity and the State's choice in who will "defend its sovereign interests in federal court," *Berger*, 597 U.S. at 192–93 (citation omitted).

Here, the Legislature's intervention is essential for this Court to enjoy full adversarial briefing against an action seeking to set aside State election law, so as to

"avoid[ ] setting aside duly enacted state law based on an incomplete understanding of relevant state interests." *Berger*, at 192. As explained above, WEC is not required to defend robustly the State or the Legislature's interests in the continued enforceability of Wisconsin's election laws when facing a federal challenge, while the Legislature is the State's duly authorized representative to do so. *See supra* pp.17–21. The Legislature also intends to invoke *Luft*, among other unique defenses, which WEC does not invoke. *See supra* pp.19–21. Thus, "[c]asting aspersions on no one," the Legislature alone will present a full, robust defense against Plaintiff's claims, reflective of its own "tactical choice[s]" that "give voice to [its] different perspective." *Berger*, 597 U.S. at 198–99; *accord Driftless*, 969 F.3d at 748.

*Second*, granting the Legislature intervention would advance the needs of "State . . . sovereign interests" by affording "[a]ppropriate respect" for the State's choice of its "duly authorized representatives . . . in federal litigation challenging state law." *Berger*, 597 U.S. at 191–92 (citation omitted). As *Berger* recognized, where, as here, a State has opted "to divide its sovereign authority among different officials and authorize their participation in a suit challenging state law, a full consideration of the State's practical interests may require the involvement of different voices with different perspectives." *Id.* at 195. Thus, the Court may not "presume a full overlap of interests when state law more nearly presumes the opposite," as this "would make little sense and do much violence to our system of cooperative federalism." *Id.* at 197.

*Third,* permitting the Legislature to intervene would pose no practical difficulties, but would, instead, allow for full adversarial litigation in this important case from State officials authorized by State law to defend the State's interests in Court. Indeed, "federal courts routinely handle cases involving multiple officials sometimes represented by different attorneys taking different positions," and the Legislature fully expects here that, "[w]hatever additional burdens adding the legislative leaders to this case may pose, those burdens [will] fall well within the bounds of everyday case management." *Id.* at 199–200 (citations omitted).

*Finally*, none of the existing parties "will be unfairly prejudiced by the legislature's presence." *Liebert*, 345 F.R.D. at 172. As noted above, the Legislature has sought to intervene in the earliest stages of this litigation, and it disclosed this intent to the Court and the parties even before filing this Motion, with its May 8, 2026, letter. *See* Dkt.13. Moreover, the Legislature will "cooperate with the existing parties and abide by [any] scheduling order." *Liebert*, 345 F.R.D. at 172.

**CONCLUSION**

This Court should grant the Legislature's Motion to Intervene.

Dated: May 13, 2026.

Respectfully submitted,

/s/ *Misha Tseytlin*

MISHA TSEYTLIN
*Counsel of Record*
(State Bar No. 1102199)
KEVIN M. LEROY
(State Bar No. 1105053)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Counsel for the Wisconsin State Legislature*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of May, 2026 a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

*/s/Misha Tseytlin*
MISHA TSEYTLIN
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**AMERICANS FOR CITIZEN VOTING PAC,**
**Plaintiff,**

**v.** **Case No. 26-CV-0786**

**MEGAN WOLFE, et al.**
**Defendants.**

---

## COURT MINUTES OF CONFERENCE

Judge Lynn Adelman, presiding Date: 5/14/2026
Time Commenced: 3:00 p.m. Concluded: 3:05 p.m.
Deputy Clerk: LEH Court Reporter: Jennifer Stake

APPEARANCES:

Plaintiff - Americans for Citizen Voting PAC : By Nathalie Burmeister

Defendants – All defendants: By Hannah S. Jurss

Interested Party - The Wisconsin State Legislature: By Kevin M. LeRoy

Nature of Conference: Telephonic Scheduling Conference

Notes: The plaintiff formally withdraws the motion for a preliminary injunction. The plaintiff advised the Court that the next signature-gathering period will begin on December of 2026, and reserves the right to move for a preliminary injunction if the case does not resolve by that time. The Court adopts the parties' proposed schedule.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

Case No. 2:26-cv-786

v.

MEAGAN WOLFE, et al.,

Defendants.

**PLAINTIFF'S RESPONSE TO THE WISCONSIN STATE LEGISLATURE'S MOTION TO INTERVENE**

Plaintiff Americans for Citizen Voting PAC ("ACV PAC"), by its undersigned attorneys at the Wisconsin Institute for Law & Liberty, pursuant to the Court's scheduling order (Dkt. 23), hereby files this response to the Wisconsin State Legislature's motion to intervene in this action.

## INTRODUCTION

Plaintiff objects to the Legislature's mischaracterization of *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022) in its intervention memorandum, but otherwise takes no position on whether the Legislature's request for intervention of right or, alternatively, for permissive intervention is warranted under Fed. R. Civ. P. 24(a) & (b).

## ARGUMENT

### I. *Berger* does not give the Legislature a per se right to intervene in federal actions challenging state law.

Intervention of right under Fed. R. Civ. P. 24(a)(2) requires a moving party to demonstrate that the existing Defendants do not adequately represent their interests. *E.g. Driftless Area Land Conservancy v. Huebsch*, 969 F. 3d 742, 746–48 (7th Cir. 2020). The Legislature argues, in part, that *Berger* is dispositive on that question. Dkt. 20:18–19. That is incorrect.

*Berger* did not create a per se rule that any state legislature statutorily authorized to defend state law is automatically entitled to intervene as of right in every federal challenge to state law. In *Berger*, the Court held only that federal courts should not apply a *presumption* of adequacy when state law authorizes multiple entities to represent the State's interests in a matter. *Berger*, 597 U.S. at 197–98. The Supreme Court still required a concrete showing of inadequacy based upon the specific facts of that case: there, the Attorney General's office was primarily interested in clarifying (rather than preserving) the law, the existing defendants had expressed reservations about the law's validity, and the defense had been relatively lax. *Id.* at 198–99; *see also Liebert v. Wisconsin Elections Commission*, 345 F.R.D. 169, 172 (W.D. Wis. 2023) ("*Berger* is not dispositive because the Court did not set forth its own standard for determining whether one state entity adequately represents the interest of another state entity when state law authorizes both to represent the state.").

Moreover, in *Berger*, the Court explained that the appointees on the Defendant commission were all gubernatorial appointees, and the Court noted that the Governor, who opposed the act (and vetoed it, but that veto was overridden) was the appointing authority for those defendant board members—so there was a real conflict there warranting a finding that the Legislature's interests were not adequately represented. *Berger* at 198. The same is simply not true here. The existing Defendants, represented by the Wisconsin Attorney General, have already filed a vigorous opposition to Plaintiff's motion for a temporary restraining order. Dkt. 14. There is no evidence that WEC will fail to mount a full defense of the challenged law.

Further, unlike the commission appointees in *Berger*, here the Legislature is effectively in control of the members of WEC. Under Wis. Stat. § 15.61, four of the six WEC commissioners are appointed *directly* by legislative leaders from the two major political parties. And while the Governor does get to appoint two of the commissioners, even then the Governor must select from a list of three names submitted by the legislative leaders for each of those two positions. So, in practical effect, all six members of WEC are legislative appointees. This structure ensures that the commission reflects the Legislature's own bipartisan composition and institutional priorities. Lastly, the remaining defendant, WEC Administrator Meagan Wolfe, is herself appointed by those same WEC commissioners and then confirmed by the Wisconsin State Senate. Wis. Stat. § 15.16(1)(b)1.

For these reasons, Plaintiff takes issue with the Legislature's mischaracterization of *Berger*, and *Berger* alone does not answer whether the

Legislature is entitled to intervene on the adequacy of existing representation component.

## II. Plaintiff takes no position on the motion to intervene.

That said, the Plaintiff takes no position on the Legislature's motion to intervene of right or its alternative motion to intervene permissively. If this Court concludes the Legislature has satisfied the requirements for intervention of right or, alternatively, believes permissive intervention would facilitate a fuller presentment of the issues, Plaintiff does not object.

## CONCLUSION

For the foregoing reasons, Plaintiff objects to the Legislature's mischaracterization of *Berger*, but otherwise takes no position on the Legislature's motion to intervene both of right and permissively.

Dated: June 4, 2026.

Respectfully Submitted,

WISCONSIN INSTITUTE
FOR LAW & LIBERTY

*Electronically signed by*
*Nathalie E. Burmeister*

Lucas T. Vebber (#1067543)
Daniel P. Lennington (#1088694)
Nathalie E. Burmeister (#1126820)

1241 N. Franklin Place
Milwaukee, WI 53202
Phone: (414) 727-9455

lucas@will-law.org
dan@will-law.org
nathalie@will-law.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

v. Case No. 26-CV-0786

MEAGAN WOLFE, et al.,

Defendants.

**DEFENDANTS' BRIEF IN OPPOSITION TO LEGISLATURE'S MOTION TO INTERVENE**

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (Gibson)
(608) 266-8101 (Jurss)
charlie.gibson@wisdoj.gov
hannah.jurss@wisdoj.gov

## INTRODUCTION

Plaintiff Americans for Citizen Voting PAC seeks a declaration invalidating a Wisconsin elections law. Defendants are the Wisconsin Elections Commission Administrator, Meagan Wolfe, and the individual commissioners in their official capacities. They are represented by the Attorney General. The Wisconsin State Legislature moves to intervene, asserting interests in seeing laws upheld and its power to enact laws. This Court should deny the motion.

Under the Wisconsin constitution's separation of powers, the Legislature rarely has a constitutional role in representing the State in litigation. This case is not one of those rare exceptions. Intervention would allow the Legislature to intrude upon the execution of the law and veto the executive branch's choices—exactly what the Wisconsin Supreme Court has said in the past two terms that it may not do. Regardless of whether the Legislature invokes Rule 24(a)(2) or (b), intervention here would violate Wisconsin's constitution.

Beyond that constitutional failing, the Legislature also fails to satisfy Rule 24(a)(2)'s and (b)'s requirements: it fails to satisfy the second and fourth prongs of Rule 24(a)(2), and under Rule 24(b), its presence will only add delay and complexity to the case.

## BACKGROUND

This matter challenges elections laws enacted under 2025 Wis. Act 126, concerning qualifications for candidate petition circulators. The Legislature seeks to intervene as a defendant, arguing that it has an interest in seeing enacted laws upheld.

The Legislature's theory of "interest" stems from a statute passed during the Legislature's December 2018 "lame duck" session, held after the election of Governor Evers and Attorney General Kaul but before they took office. 2017 Wis. Act 369. Act 369 included a wide swath of new provisions; several sought to impose legislative "litigation control" over the executive branch's litigation and settlement of court actions. *Serv. Emps. Int'l Union, Loc. 1 v. Vos* ("*SEIU*"), 2020 WI 67, ¶¶ 3, 50–51, 393 Wis. 2d 38, 946 N.W.2d 35, *overruled in part on other grounds by Evers v. Marklein* ("*Evers II*"), 2025 WI 36, 417 Wis. 2d 453, 22 N.W.3d 789.

One form of litigation control involved legislative intervention; the Legislature had previously had only limited power to intervene in litigation involving the State. *SEIU*, 393 Wis. 2d 38, ¶ 51. Act 369 allowed the Legislature's Joint Committee on Legislative Organization to authorize the Legislature, or one house thereof, to intervene as the Legislature, Assembly, or Senate in certain circumstances. Wis. Stat. § 13.365(3). It also provided that, in the types of cases authorized by Wis. Stat. § 13.365(3), the assembly, the

senate, or the Legislature "may intervene . . . at any time in [an] action." Wis. Stat. § 803.09(2m); *see also* Wis. Stat. § 13.365(1)–(2) (allowing intervention by the assembly or senate). To pay outside counsel for that purpose, the Joint Committee has an unlimited, sum sufficient appropriation. Wis. Stat. § 13.365(1)–(2) (citing appropriation under Wis. Stat. § 20.765(1)(a), (b)).

After the law's passage, the Legislature intervened in a multitude of cases, particularly election-related cases. As of mid-2025, the Legislature had reportedly spent $25 million in taxpayer funds on private law firms to oppose executive orders, defend statutes including election provisions, and other similar matters.[1] This included almost $2 million in 2020 on involvement in election lawsuits against the Commission alone.[2] The top-paid firm has been the Legislature's counsel here, Troutman Pepper, which, according to recent publicly available data, has made $10.6 million representing the Legislature since 2017.[3]

---

[1] Francesca Pica, et al., *Wisconsin Legislature Spent $26.2 Million in Taxpayer Money on Private Attorneys Since 2017*, Milwaukee J. Sentinel (July 17, 2025), https://www.jsonline.com/story/news/politics/2025/07/17/gop-legislature-paid-millions-to-lawyers-on-gableman-maps-cases/84230957007/.

[2] Patrick Marley, *Republicans Spend Nearly $2 million in Taxpayer Money to Fight Election Lawsuits*, Milwaukee J. Sentinel (Oct. 15, 2020), https://www.jsonline.com/story/news/politics/2020/10/15/gop-spends-nearly-2-million-taxpayer-money-fight-election-suits/3654160001/.

[3] Pica, et al., *supra* note 1.

After passage of Act 369, parties brought a series of cases challenging provisions in that Act and earlier laws on separation of powers grounds. Particularly in the last two terms, the resulting Wisconsin Supreme Court decisions have clarified Wisconsin's separation of powers doctrine as it applies to legislative incursions into the power of the executive branch.

## ARGUMENT

The Court should deny the Wisconsin Legislature's motion for intervention. Aside from the requirements of Rule 24, intervention would violate the Wisconsin Constitution: the Legislature cannot constitutionally intervene to defend an enacted law that the Attorney General and executive branch are defending. In its most recent two terms, the Wisconsin Supreme Court has made clear that (1) the Legislature cannot execute the law in lieu of the executive branch, and (2) handling litigation for the State is part of executing the law, a task entrusted to the executive branch.

Even aside from that constitutional failing, the Legislature fails the test for intervention under Rules 24(a)(2) and (b): it fails to satisfy the second and fourth prongs of Rule 24(a)(2), and for Rule 24(b), its presence will only add to the work and complexity of the case.

### I. Intervention by the Legislature would violate the Wisconsin Constitution's separation of powers.

The Legislature asserts that it has an interest in ensuring that a Wisconsin law is upheld (Dkt. 20:13–14) and is entitled to intervene

even though the Attorney General and Commission defendants are vigorously defending the case. It also claims it has an interest in its power in "enacting" laws, (Dkt. 20:15–16), although it doesn't articulate how a law's constitutionality under the First Amendment goes to a state legislature's power to enact a law. Neither of these interests implicates a constitutional role for the Legislature that entitles it to litigate this case.

Regardless of the intervention rule the Legislature proceeds under, intervention would violate Wisconsin's constitutional separation of powers because it would allow the Legislature to execute the law. As the Wisconsin Supreme Court recognized unanimously last year in *Kaul v. Legislature*, 2025 WI 23, 416 Wis. 2d 322, 21 N.W.3d 513, handling litigation is a predominately core power of the executive branch: the Legislature may not intrude unless the particular litigation implicates a constitutional role of the Legislature.

### A. Wisconsin's separation of powers divides governmental power among the three branches and allows the Legislature to make laws, not to execute them.

Like the U.S. Constitution, the Wisconsin Constitution divides governmental power among the three branches of government: the legislative, which makes the law; the executive, which executes the law; and the judiciary, which resolves disputes over what the law means. To preserve this balance of

power, the legislative branch's constitutional role ends when a bill becomes law; thereafter, the executive branch implements the enacted law.

### 1. The Wisconsin Constitution guards against the concentration of power in a single branch.

Wisconsin's separation of powers derives from three constitutional vesting clauses that divide the core powers of government among three branches. State administrative agencies (like the Commission) are "part of the executive branch" and carry out executive functions. *SEIU*, 393 Wis. 2d 38, ¶ 60; *see also* Wis. Stat. §§ 15.61 (creation of elections commission; part of subch. III ("Independent Agencies") of Wis. Stat. ch. 15 ("Structure of the Executive Branch"); 15.01(9) ("'Independent agency' means an administrative agency within the executive branch created under subch. III"); 15.02 ("independent agency" is a "principal administrative unit of the executive branch").

Separating these powers provides the "central bulwark of our liberty," *SEIU*, 393 Wis. 2d 38, ¶ 30, by guarding against the "concentration of governmental power" in a single branch. *Gabler v. Crime Victims Rights Bd.*, 2017 WI 67, ¶ 4, 376 Wis. 2d 147, 897 N.W.2d 384. Through this separation, the constitution "ensure[s] that each branch will act on its own behalf and free from improper influence by the others." *Id.* ¶ 32.

Because the legislative branch writes the laws, the separation of powers doctrine is especially wary of its stripping away power from co-equal branches through legislation. The legislative usurpation of executive power poses a particular danger because it results in the "same persons who have the power of making laws"—that is, legislators—"also [having] in their hands the power to execute them." *Id.* ¶ 5 (quoting John Locke, *The Second Treatise of Civil Government*, § 143 (1764)).

### 2. The legislative branch's power is to make laws, not to execute them.

The legislative branch "may not 'invest itself or its Members with either executive power or judicial power.'" *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991) (citation omitted). Policing this principle requires distinguishing between executive and legislative power. This task is "not always easy," *SEIU*, 393 Wis. 2d 38, ¶ 34, but some basic principles lie beyond debate.

Generally, "[l]egislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them." *Koschkee v. Taylor*, 2019 WI 76, ¶ 11, 387 Wis. 2d 552, 929 N.W.2d 600 (citation omitted). More specifically, the Legislature has constitutional authority "to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; and to fix the limits within which the law shall operate."

*Id.* (citations omitted). So, when the legislative branch wants to achieve a policy goal, it may enact statutes that empower the executive branch to administer a new program and tell the executive branch how to do so.

After the lawmaking process is complete, the baton passes to the executive branch to execute the law. *Evers v. Marklein* ("*Evers I*"), 2024 WI 31, ¶ 15, 412 Wis. 2d 525, 8 N.W.3d 395; *SEIU*, 393 Wis. 2d 38, ¶ 95. In *Evers I*, the Wisconsin Supreme Court emphasized that the "executive branch's role is to effectuate the policies passed by the legislature." 412 Wis. 2d 525, ¶ 15. When "executing the law, the executive branch must make decisions about how to enforce and effectuate the laws": to decide what the law requires and how to apply it. *Id.* ¶¶ 15–16.

*Evers I* struck down statutes giving the Legislature's Joint Committee on Finance the power to veto program decisions of the Department of Natural Resources because they allowed a legislative body to execute the law. The court held that the challenged statutes "effectively create a legislative veto," allowing the Legislature to

> interfere with and even override the executive branch's core power of executing the law . . . The review process ultimately permits the members of the JFC to serve as gatekeeper to the exercise of a core executive function. . . . This unfettered interference by the committee oversteps the boundaries of legislative authority by arrogating the executive branch's core power to choose which conservation projects best carry out the statutory purposes of the Program.

*Id.* ¶ 24. The court held that once the statutes are enacted, the Legislature may not "insert itself into the machinery of the executive branch in an attempt to control the executive branch's ability to carry out the law." *Id.* ¶ 23.

Because the power to execute the law is vested in the executive branch, only the executive branch may exercise it. Neither the Legislature nor the executive branch may "possess directly or indirectly, an overruling influence over the other in the administration of their respective powers." *Id.* ¶ 16 (citation omitted). If the Legislature wishes to influence how its laws are carried out, it may pass legislation.

It matters not that the Legislature believes that its choices are better than those the executive branch may make. Is "entirely irrelevant" whether "[t]he legislature may see itself as a benign gatekeeper." *SEIU*, 393 Wis. 2d 38, ¶ 107.

### B. The defense of this litigation constitutes core executive power, implicating no legislative power.

The Attorney General and Commission Defendants' defense of the law here constitutes core executive power. The Legislature has no constitutional role to defend the state's interest in litigation here, and so intervention would unconstitutionally interfere with the executive branch's exercise of its own power.

### 1. Litigating on behalf of the state is an executive power unless a specific constitutional role for the Legislature is impacted.

Last term, in *Kaul*, the Wisconsin Supreme Court applied the principles of *Evers I* to a constitutional challenge to a companion provision of the Act 369 intervention provision at issue here. The Attorney General sought a declaration that section 26 of Act 369, which required the Department to obtain permission to settle all plaintiff's-side civil actions, violated the separation of powers as to two broad categories of cases: civil enforcement violations and executive agency administration actions. *See Kaul*, 416 Wis. 2d 322, ¶¶ 1–3. The supreme court agreed.

*Kaul* emphasized that "[l]itigation on behalf of the state is chiefly a core executive function." *Id.* ¶ 27. And where the Legislature empowers the Department to represent the state in particular claims, "it necessarily confers discretion on how to pursue the claims to completion, through settlement or otherwise." *Id.* ¶ 23. The court held that conducting litigation is not a core executive power only where a constitutional power of the Legislature is implicated. *Id.* ¶ 28. The *Kaul* court rejected the Legislature's suggestion that representing the state in litigation is a shared power between the executive and legislative branches. *Id.* ¶¶ 26–27.

While *Kaul* involved the Department's resolution of plaintiff's-side cases, the same principles apply here. The Attorney General is a "high constitutional executive officer." *SEIU*, 393 Wis. 2d 38, ¶ 60 (citation omitted); Wis. Const. art. VI, § 3. He is statutorily charged with defending state agencies named in civil litigation. Wis. Stat. § 165.25(6). Since 1849, the Attorney General has exercised the executive powers traditionally held by a state's chief legal officer, including representing the state and its entities in litigation. *See* Wis. Rev. Stat. ch. 9, §§ 36–41 (1849). The Attorney General carries that law into effect when it defends executive agency clients in litigation. How he conducts that litigation, like the litigation in *Kaul*, is a core executive function into which the Legislature may not intrude.

The Legislature can constitutionally be a litigant in cases impacting its own constitutional powers, but those cases are rare exceptions. It can challenge a gubernatorial veto, for example, because that veto affects the Legislature's constitutional role in passing bills. *SEIU*, 393 Wis. 2d 38, ¶ 72 n.21 (listing cases brought by Legislature challenging Governor's veto of passed budget bills). But that role no longer exists once a law is enacted: it is then up to the executive branch to carry out the law, including by defending it. *See Evers I*, 412 Wis. 2d 525. In such cases, permitting the Legislature to defend the law alongside the Attorney General transfers core executive branch power to the Legislature.

Intervention gives the Legislature the power to control the strategy, handling, and disposition of the case: an intervening party is a full participant in the lawsuit with all the rights of a party. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 508 (7th Cir. 1996). The Wisconsin constitution gives that power to the executive branch, not to the Legislature.

Courts in other states have recognized that allowing the legislature to direct litigation violates the separation of powers. *See, e.g., Arizona v. Block*, 942 P.2d 428, 429–31 (Ariz. 1997) (en banc) (striking down state law that gave a legislatively-controlled committee the power to hire outside counsel and pursue litigation relating to any federal law, regulation or order); *State Through Bd. of Ethics v. Green*, 545 So. 2d 1031, 1036 (La. 1989) (striking a statute that allowed the Louisiana legislature to file a lawsuit to collect penalties, on separation of powers grounds); *Stockman v. Leddy*, 129 P. 220, 223 (Colo. 1912), *overruled on other grounds by Denver Ass'n for Retarded Children, Inc. v. Sch. Dist. No. 1*, 535 P.2d 200, 204 (1975) (striking a statute that gave the legislature the power to bring cases for certain purposes, on separation of powers grounds).

In the first Wisconsin case since *Kaul* deciding whether the Legislature can intervene in litigation that the executive branch is defending, a Wisconsin circuit court held that it would violate *Kaul* and the Wisconsin separation of

powers for the Legislature to intervene. *Disability Rights Wisconsin v. Wisconsin Elections Commission* involved a challenge to a Wisconsin elections statute regulating how voters receive and return absentee ballots. *See DRW v. WEC,* No. 24-CV-1141 (Wis. Cir. Ct. Dane Cnty. Jan. 26, 2026). The court denied the Legislature's motion to intervene because it would violate the separation of powers under *Kaul*:

> In light of [*Kaul*], WEC contends that "[a]llowing the [l]egislature to intervene here gives it the same power to control the handling of litigation rejected in Kaul."
>
> I agree. The present case will require WEC, through its counsel DOJ, to litigate whether the elections code unlawfully denies the plaintiffs some kind of right. Just as in *Kaul*, "DOJ's litigation in these categories of cases is, rather straightforwardly, the execution of laws enacted by the Legislature." Allowing the legislature to intervene under § 803.09(2m) would be to give the legislature a part of that core executive power to execute the laws. The separation of powers prohibits this and, accordingly, I conclude § 803.09(2m) is unconstitutional as applied to the specific facts of this case. I therefore deny the legislature's motion to intervene under §803.09(2m).

(Decl. of Charlotte Gibson, Ex. 1:15 (citation omitted).) The Legislature has appealed that ruling,[4] but the trial court's holding was a straightforward application of *Kaul*.

[4] *Disability Rights Wisconsin v. WEC* Appeal Number 2026AP535, Wis. Ct. Sys. Sup. Ct. & Ct. App. Access, https://wscca.wicourts.gov/case/2026AP000535 (last visited June 4, 2026).

Like the types of litigation at issue in *Kaul* and *Disability Rights*, the case before this Court impacts no constitutional power of the Legislature. Allowing the Legislature to intervene would give it the same power to control the handling of the litigation that the Wisconsin Supreme Court rejected in *Kaul*. It is not the Legislature's constitutional role to litigate this case alongside the executive branch.

**2. *SEIU*, *Bostelmann*, and *Berger* do not support its claim to intervene here.**

The Legislature points to *SEIU* and *Democratic National Committee v. Bostelmann*, 2020 WI 80, 394 Wis. 2d 33, 949 N.W.2d 423, from the Wisconsin Supreme Court, and *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022), from the U.S. Supreme Court, to argue that it has an "interest" to participate in litigation to ensure that statutes continue to be enforced. (Dkt. 20:4–5, 14, 16, 18.) Those cases do not resolve the constitutional problem here.[5]

*SEIU*, brought soon after passage of 2017 Wis. Act 369, challenged numerous provisions of the Act in full, including the new intervention provision. Because the case was a facial challenge, the court saw its job as

[5] The Legislature also cites *Liebert v. WEC*, 345 F.R.D. 169 (W.D. Wis. 2023), where a district court granted the Legislature's motion to intervene in a challenge to a state law. (Dkt. 20:20.) That motion was decided before *Evers I* and *Kaul*, and the court did not decide whether intervention would violate Wisconsin's separation of powers.

evaluating whether there could be *any* constitutional applications of each challenged provision. 393 Wis. 2d. 38, ¶ 4. Applying that standard, the court denied the facial challenge to Wis. Stat. § 803.09(2m).

The court identified one application where the Legislature's intervention would be constitutional: in a case challenging a governor's power to veto bills the Legislature passed. *See SEIU,* 393 Wis. 2d. 38, ¶ 72 n.21 (listing cases). That type of case, however, involved the Legislature's defense of its institutional power to *pass* a law, not to defend an *enacted* law.

After *SEIU*, the Legislature attempted to characterize *SEIU* as recognizing a broader constitutional role for the Legislature, pointing to the court's comment that "[w]hile representing the State in litigation is predominately an executive function, it is within those borderlands of shared powers, most notably in cases that implicate an institutional interest of the legislature." *Id.* ¶ 63. But in *Kaul*, the supreme court rejected that interpretation; the court clarified that representing the State is a shared power *only* where a constitutional power of the Legislature is implicated. *Kaul*, 416 Wis. 2d 322, ¶¶ 26–28.

*Bostelmann* gets the Legislature no further. That case addressed the statutory scope of Wis. Stat. § 803.09(2m), not the statute's constitutionality under the separation of powers. The court stated that it did not address separation of powers concerns because of the rushed nature of that

proceeding—a certification question from the Seventh Circuit about the type of "interest" conferred by Wis. Stat. § 803.09(2m) for purposes of Rule 24(a)(2)'s "interest" prong. 394 Wis. 2d 33, ¶ 4 n.2 (question not a "wide-ranging constitutional inquiry," and noting lack of time for parties to address the separation-of-powers issue), ¶ 26 (Dallet, J., dissenting) (flagging separation-of-powers question for future cases).

For the limited task of statutory interpretation, and in a situation where no executive branch official was defending the law,[6] *Bostelmann* held that Wis. Stat. § 803.09(2m) gave the Legislature a statutory interest not only where its legislative interests were implicated, but in defending state statutes. *Bostelmann*, 394 Wis. 2d 33, ¶ 8. Construing the scope of Wis. Stat. § 803.09(2m) is a separate inquiry from determining the statute's constitutionality under the separation of powers, however, and the court expressly declined to take up the latter question.

*Berger* also decided no state constitutional law question. It was about the criteria for intervention under Rule 24(a)(2), not whether a legislature's intervention would violate a state constitution's separation of powers doctrine.

---

[6] The Attorney General had withdrawn as the defendants' counsel due to a conflict, and the appointed special counsel declined to appeal an adverse ruling. *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1505640, *1 (W.D. Wis. Mar. 28, 2020) (Attorney General withdrawing and replaced with outside counsel); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639 (7th Cir. 2020) (Legislature only appealing party).

The Court considered whether North Carolina legislators satisfied the "interest" prong of Rule 24(a)(2) where a state statute authorized them to intervene in litigation "as agents of the State." 597 U.S. at 193 (citation omitted). In answering that question, the Court relied on the scope of the state statute, not the law's constitutionality under state law.

*Berger* mentioned North Carolina's separation of powers only as a waived argument. North Carolina officials had argued alternatively that the law violated that State's separation of powers doctrine, but the Court treated the question as waived because the officials had agreed to permissive intervention—and intervention would present the same constitutional concerns regardless of whether it was mandatory or permissive. *Id.* at 194.

Neither *SEIU*, *Bostelmann*, nor *Berger* supports that legislative intervention to defend state laws would comport with Wisconsin's separation of powers doctrine.

* * * * *

As in *Kaul* and *Disability Rights*, intervention by the Legislature here would violate Wisconsin's separation of powers doctrine. This Court should deny the Legislature's motion on that basis.

## II. The Legislature also does not justify intervention under Rule 24(a)(2) or (b).

The constitutional problem resolves the motion against the Legislature, since intervention would violate the Wisconsin constitution's separation of powers regardless of whether it occurred under Rule 24(a)(2) or 24(b). But independently of that infirmity, the Legislature also fails to satisfy the second and fourth prong of Rule 24(a)(2), and it fails to justify permissive intervention under Rule 24(b), as well.

### A. The Legislature does not satisfy the fourth prong required for mandatory intervention under Rule 24(a)(2).

A party seeking intervention must meet all four of Rule 24(a)(2)'s elements: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 686 (7th Cir. 2023) (quoting *State v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019)); Fed. R. Civ. P. 24(a)(2). The movant bears the burden of establishing its entitlement to intervene as of right, and the failure to meet any of the elements requires denial of the motion. *Keith v. Daley*, 764 F.2d 1265, 1268 (7th Cir. 1985). Here, the Legislature cannot show the second and fourth factors: (1) a cognizable interest in the proceeding and

(2) that any interests it has will not be adequately represented by the existing parties.

**1. The Legislature does not have a cognizable interest where other parties are defending the laws.**

First, the Legislature does not have an interest under Rule 24(a)(2)'s second prong where the executive branch is defending the law.

The U.S. Supreme Court has recognized a cognizable interest for state legislative bodies, whether for standing or intervention purposes, only where they act as an agent for the State, not where they represent a legislative interest in seeing a law upheld. *Compare Berger*, 597 U.S. at 193 (legislators had an interest under Rule 24(a)(2) where state law authorized them to act as an agent for the State), *with Virginia House of Delegates v. Bethune-Hill*, 587 US. 663–64 (2019) (Virginia house did not have a cognizable interest where Virginia law did not authorize them to act as the state). To determine the capacity in which a legislature acts, the Court has looked at a state's laws. *Berger*, 597 U.S. at 193; *Va. House of Delegates*, 587 U.S. at 663.

As to Wisconsin's relevant law, Wis. Stat. § 803.09(2m), *Bostelmann* construed it as empowering the Wisconsin legislature to act for the State in the context of a case that no other party was defending. It was not asked to address an ordinary situation where the executive branch and Attorney General are defending challenged statutes. *Bostelmann*, 394 Wis. 2d 33, ¶ 25 (Dallet, J.,

dissenting) ("The majority appears troubled by the notion that the attorney general or appointed special counsel could discharge its duty to represent the state's interests by declining to pursue an appeal."); ¶ 25 n.3 (Dallet, J., dissenting) (discussing absurdity of construing statute to include situations where executive branch is present).

**2. The Legislature fails to show that the existing defendants and Attorney General are inadequately representing any interests the Legislature may have.**

Separately, the Legislature cannot show that any interests it may have are inadequately represented for purposes of Rule 24(a)(2)'s fourth prong. Relying on *Berger*, the Legislature says that there is no presumption of adequacy, as there would be in a situation where a private party sought to intervene and the Attorney General were defending a law. *See Bost*, 75 F.4th at 690. But the Legislature takes *Berger* too far, suggesting that it need not show inadequacy at all. (Dkt. 20:19.) That is incorrect.

*Berger* did not stop once it decided that the presumption of adequacy did not apply: it explained why the Board defendant's representation there did not adequately protect the interest in defending the law. In the course of the case, the defendant Board (1) offered no witness affidavits, even though the other side did; (2) did not seek a stay of the trial court's initial order; (3) described its job not as defending the law, but instead "obtaining guidance about" which version of the law would be in place; and (4) potentially had a conflict, since

the members' appointing authority (who could apparently remove them) filed an amicus brief asserting that the law was unconstitutional. *Berger*, 597 U.S. at 198, 187, 189.

Here, no such facts are in play. The Commission and Attorney General swiftly responded to Plaintiff's motion for a temporary restraining order with a 30-page brief comprehensively addressing the relevant First Amendment merits and other injunction factors, as well as a declaration that addressed both the harms presented by a temporary injunction and compelling reasons for the law. (Dkt. 16–17.) Indeed, the Legislature's motion cites from those materials in describing the case. (Dkt. 20:8.) The Legislature, in contrast, filed a letter indicating that it planned to move to intervene and asking for a briefing schedule for a preliminary injunction motion. (Dkt. 13).

In light of those filings, inadequacy is nowhere in sight. The Legislature offers two ideas: (1) Defendants' brief did not mention *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020), a case applying *Anderson/Burdick* in the voter ID context, and (2) in a few other cases, the Elections Commission has employed litigation strategies the Legislature disagrees with. (Dkt. 20:19–21.) Those points do not come close to showing inadequacy. Whether Defendants chose to cite a particular case in their TRO opposition says nothing about the strength of the filing. And litigation strategies in other cases say nothing about an adequate defense in the case at hand.

The Legislature fails the second and fourth prongs of the intervention test and is not entitled to intervene as of right.

**B. The Legislature also fails to justify permissive intervention under Rule 24(b).**

The Legislature also fails to justify permissive intervention under Rule 24(b). The Rule provides that a court may permit intervention as a matter of discretion if (1) the motion is timely and (2) the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The court, in exercising its discretion, must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Thus, a court may deny permissive intervention where "adding the proposed intervenors could unnecessarily complicate and delay all stages of this case." *One Wis. Inst., Inc. v. Nichol*, 310 F.R.D. 394, 399 (W.D. Wis. 2015).

Here, even if the Legislature had a defense that shares common questions with the main action, permissive intervention would be inappropriate because adding more defendants would only complicate and delay this case. This election law case should be streamlined and decided quickly without unnecessarily using up the court's time and resources with redundant defendants and process. The Legislature's asserted interests are

closely aligned with those of the Commission, such that its addition as a party would add little substance.

This is a case about the constitutionality of non-partisan election statutes. The Commission and its counsel are defending those laws, and adding additional defendants with the same goals would only complicate the litigation. If the Legislature believes it has arguments that no other party will make, this Court could grant it leave to participate as an amicus.

## CONCLUSION

This Court should deny the Wisconsin Legislature's motion to intervene.

Dated this 4th day of June 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (Gibson)
(608) 266-8101 (Jurss)
(608) 294-2907 (Fax)
charlie.gibson@wisdoj.gov
hannah.jurss@wisdoj.gov

## CERTIFICATE OF SERVICE

I certify that on June 4th, 2026, I electronically filed the foregoing Defendants' Brief in Opposition to Legislature's Motion to Intervene with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 4th day of June 2026.

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

AMERICANS FOR CITIZEN VOTING PAC,

*Plaintiff*,

v.

MEAGAN WOLFE, ANN S. JACOBS, MARK L. THOMSEN, CARRIE RIEPL, DON M. MILLIS, ROBERT F. SPINDELL, JR., *and* MARGE BOSTELMANN, *in their official capacities as Wisconsin Elections Commissioners*,

*Defendants*.

Case No. 2:26-cv-786

---

# THE WISCONSIN STATE LEGISLATURE'S REPLY IN SUPPORT OF MOTION TO INTERVENE

---

MISHA TSEYTLIN
*Counsel of Record*
(State Bar No. 1102199)
KEVIN M. LEROY
(State Bar No. 1105053)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Counsel for the Wisconsin State Legislature*

## INTRODUCTION

The Wisconsin State Legislature ("Legislature") moved to intervene in this case to offer a unique and robust defense of 2025 Wisconsin Act 126 ("Act 126"). The State of Wisconsin decided that this is how it wants its laws defended in court when it enacted Wis. Stat. § 803.09(2m) ("Section 803.09(2m)"), which is the type of statute that *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179 (2022), determined federal courts must respect in these circumstances.

Defying *Berger*, the Administrator and the Commissioners of the Wisconsin Elections Commission ("WEC") urge this Court to deny Wisconsin the prerogative that the Supreme Court has said that every State is entitled to. The basis for WEC's argument is that standard separation-of-powers principles prohibit legislatures from defending statutes they enacted in court. WEC does not point to any aspect of the Wisconsin Constitution's separation-of-powers doctrine that makes legislative defense of state law disfavored. Rather, WEC cites generic separation-of-powers principles that would apply to any State that has a legislative branch and an executive branch (that is, all the States). WEC's position finds no support in any Wisconsin case (or, indeed, in any federal case or even any state case, from any other State), and, if accepted, it would render *Berger* a nullity.

This Motion To Intervene should be easy under *Berger*. Per *Berger*, this Court must give respect to Wisconsin's choice in Section 803.09(2m) as a matter of comity. *Berger* admits of no "presumption of adequate representation" by WEC, as "a State's chosen representatives should be greeted in federal court with respect, not adverse

presumptions." 597 U.S. at 197. But if any further inquiry were needed, WEC's failure to respond substantively to the Legislature's invocation of *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020), or to the Legislature's arguments regarding WEC's erratic decisions of when it will or will not defend state election laws, Dkt.25 ("WEC.Opp.") at 20–21; Dkt.20 ("Mot.") at 20–21, suffices to show inadequacy.

Alternatively, if this Court does not wish to confront the *Berger* issue, it can simply grant the Legislature permissive intervention under Rule 24(b), as Judge Peterson did in materially indistinguishable circumstances in *Liebert v. WEC*, 345 F.R.D. 169 (W.D. Wis. 2023). While WEC briefly asserts, WEC.Opp.5, that even permissive intervention would violate the Wisconsin Constitution, that position is obviously wrong. This Court's authority to grant permissive intervention flows from federal law, so even if WEC's position had any grounding in the Wisconsin Constitution—which it clearly does not—this would not constrain this Court's permissive-intervention authority under the Rules Enabling Act and the Supremacy Clause.

## ARGUMENT

### I. WEC's Argument That This Court Should Deny The Legislature's Intervention As Of Right Under Rule 24(a) Asks This Court To Defy The Supreme Court's Decision In *Berger*

A. The Legislature satisfies each of the four elements for intervention as of right under Rule 24(a). Mot.11–21. First, the Legislature's Motion is timely. Mot.12–13. Second, the Legislature has an interest in this litigation, which challenges the constitutionality of Act 126. Mot.13–16. Wisconsin has statutorily authorized the Legislature to litigate as its agent in defense of state law in federal court, Wis. Stat.

§ 803.09(2m), and—as the Supreme Court held in *Berger*—a State possesses the "prerogative to select which agents may defend its laws and protect [these] interests" in federal court, 597 U.S. at 197; Mot.13–14. Separately, the Legislature has an independent interest in defending the efficacy and integrity of its own constitutional authority to make laws, including Act 126. Mot.15–16. Third, this litigation impairs the Legislature's sovereign interests by challenging Act 126 on federal-constitutional grounds. Mot.16. Finally, no other party adequately represents the Legislature's interests. Mot.17–21. Plaintiff is adverse, given that it seeks a declaration that Act 126 is unconstitutional. Mot.18. WEC does not adequately represent the Legislature either. Mot.17–21. As *Berger* holds, this Court should give respect to Wisconsin's sovereign choice to "select" the Legislature as its "agent[ ]," meaning that other agents of the State are not adequate representatives even if they possess similar interests. 597 U.S. at 197; Mot.18–19. And while not required, given *Berger*, the Legislature intends to raise different defenses than WEC regarding the impact of *Luft*, 963 F.3d 665, on the controlling standard here. Mot.19–20. WEC's inconsistent history of defending Wisconsin's election laws also shows that it is an inadequate representative in the present case. Mot.20–21.

B. In its Opposition, WEC primarily argues that the Legislature's intervention to defend a duly enacted law would violate the separation-of-powers principles found in the Wisconsin Constitution. WEC.Opp.4–17. WEC is asking this Court to defy *Berger*, which requires federal courts to honor state statutes just like Section 803.09(2m), and that is reason enough to disregard this argument. *See infra*

pp.4–6. If, however, this Court does consider WEC's state-constitutional arguments, notwithstanding *Berger*, those arguments are without merit. *See infra* pp.6–10. And to the extent that any further "adequacy" analysis is appropriate in light of *Berger* and Section 803.09(2m), WEC's failure to engage with the substance of Legislature's lack-of-adequacy arguments makes this an easy issue as well. *See infra* pp.10–12.

1. *Berger* refutes WEC's argument that this Court should not honor Section 803.09(2m). *See* WEC.Opp.4–5. In *Berger*, the Supreme Court held 8-1 that North Carolina legislative leaders had a right to intervene under Rule 24(a) because state law authorized them to defend that State's statutes. 597 U.S. at 185–87, 200. As *Berger* explained, States may statutorily "allocate authority [to defend state law] among different officials who do not answer to one another" without violating traditional separation-of-powers principles because the executive branch does not hold "a constitutional monopoly on representing" the State and, absent such statutes, state law may go undefended. *Id.* at 191–94. States "may authorize [their] legislature[s] 'to litigate on the State's behalf, either generally or in a defined class of cases.'" *Id.* at 192 (citations omitted). Wisconsin did exactly what *Berger* endorsed with Section 803.09(2m), authorizing "the assembly, the senate, and the legislature [to] intervene" in "challenges in . . . federal court [to] the constitutionality of a statute." Wis. Stat. § 803.09(2m). That "expressly authorize[s] [Wisconsin's] legislative leaders to defend the State's practical interests in litigation of this sort." 597 U.S. at 193.

WEC argues that Wisconsin cannot enact the type of statute that *Berger* endorses because defending duly enacted law is only an "executive" function. WEC.Opp.7–14. WEC suggests that *Berger* is inapplicable because it "decided no state constitutional law question," but rather "was about the criteria for intervention under Rule 24(a)(2)" by "agents of the state." WEC.Opp.16–17 (citation omitted). But *Berger* considered whether "the statutes authorizing the legislative leaders to participate [t]here violate the State Constitution by usurping authority vested in the executive branch." 597 U.S. at 193–94. The Court found those arguments unpersuasive, given that the proponent there—like WEC here—did not "identify anything to support its suggestion that the State's executive branch holds a constitutional monopoly on representing [the State's] practical interests in court." *Id.* at 194. What is more, *Berger* provided four pages discussing a State's right to pass an intervention statute authorizing legislative intervention. *Id.* at 191–95. Thus, the Court did not simply "mention[ ]" "a waived argument," WEC.Opp.17, but rather endorsed constitutional systems permitting intervention by state-legislative branches, *see id.* at 191–95. Given this binding authority, as well as WEC's failure to identify anything that suggests that the Wisconsin Constitution is different in a material respect, this Court need not further consider WEC's arguments.

Endorsing WEC's arguments would render *Berger* a nullity. In making its separation-of-powers arguments against Section 803.09(2m), WEC does not cite anything even arguably unique about Wisconsin's separation-of-powers framework suggesting that the Legislature's defense of state law in court impedes the executive's

authority to execute those laws. *See generally* WEC.Opp.4–17. Instead, WEC recites generic separation-of-powers principles that could apply in any State that has a legislative branch and executive branch (that is, every State), *see, e.g.*, WEC.Opp.5–9, thereby rendering *Berger* meaningless. WEC even invokes a *federal* separation-of-powers case, WEC.Opp.7 (citing *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991)), further highlighting that its arguments have nothing to do with Wisconsin in particular.[1]

2. If this Court nevertheless concludes that it needs to engage with WEC's state-constitutional arguments, notwithstanding *Berger*, it should reject those arguments because Section 803.09(2m) does not violate the Wisconsin Constitution.

The separation-of-powers analysis in Wisconsin "begins by determining if the power in question is [a] core" power of a single branch or a "shared" power among the branches. *Service Emps. Int'l Union, Loc. 1 v. Vos* ("*SEIU")*, 946 N.W.2d 35, 47, 54 (Wis. 2020); *State ex rel. Kaul v. Prehn*, 976 N.W.2d 821, 833–34 (Wis. 2022) (citations omitted). Core powers are "zones of authority constitutionally established for each branch . . . upon which any other branch of government is prohibited from intruding."

[1] WEC's three out-of-state cases only shows how unprecedented its theory is. WEC.Opp.12. None of those cases even arguably suggest that *defending* state law in court is only an executive function; rather, they considered a legislature's agency-like execution of laws. So, in *State ex rel. Woods v. Block*, 942 P.2d 428 (Ariz. 1997), the Arizona statute at issue permitted the Arizona legislature to "maintain[ ] control over an executive agency." *Id.* at 435. Similarly, in *Stockman v. Leddy*, 129 P. 220 (Colo. 1912), the Colorado Legislature had appropriated money to itself to pursue agency-like investigation of Colorado's streams and rivers. *See id.* at 221–23. And the law at issue in *State Through Board of Ethics for Elected Officials v. Green*, 545 So. 2d 1031 (La. 1989), granted the legislature agency-like powers relating to investigations, rulemaking, and collection of fines. *See id.* at 1034.

*League of Women Voters of Wis. v. Evers*, 929 N.W.2d 209, 221 (Wis. 2019) (citation omitted). "Shared powers" "are those that lie at the intersections of these exclusive core constitutional powers," and each branch "may exercise [the] power" provided that no branch "unduly burden[s] or substantially interfere[s] with another." *SEIU,* 946 N.W.2d at 47, 54 (citation omitted). The Legislature's core powers include "vast" "legislative power" to "make laws," which "encompasses the ability to determine whether there shall be a law, to what extent the law seeks to accomplish a certain goal, and any limitations on the execution of the law." *Evers v. Marklein ("Evers I")*, 8 N.W.3d 395, 402 (Wis. 2024) (citations omitted). The "quintessential core power belonging to the executive branch is the power to take care that the laws be faithfully executed." *Kaul v. Wis. State Legislature*, 21 N.W.3d 513, 520 (Wis. 2025) (citation omitted).

Defending state law is a shared power under the Wisconsin Constitution, and thus the Legislature may constitutionally exercise that power under Section 803.09(2m). The Legislature has "constitutional institutional interest[s]" in certain cases that justify its intervention. *SEIU*, 946 N.W.2d at 51–56. Those "constitutional institutional interest[s]," *id.* at 56, include defense of the Legislature's core power to "make laws," *Evers I*, 8 N.W.3d at 402, as the Legislature has a "legitimate interest in the continued enforcement of [its] own statutes," *Berger*, 597 U.S. at 191 (brackets altered). Cases challenging the constitutionality of statutes duly enacted by the Legislature threaten the Legislature's "ability to determine whether there shall be a

law," *Evers I*, 8 N.W.3d at 402, giving the Legislature a "constitutional institutional interest" supporting its intervention in such cases, *SEIU*, 946 N.W.2d at 56.

WEC argues that intervention here would violate the Wisconsin Constitution's separation of powers, WEC.Opp.4–9, but WEC has no coherent explanation as to *how* the Legislature defending state law in court violates WEC's (or any other executive body's or officer's) constitutional authority. To "defend" a law means "to support or uphold by speech or argument;" to "deny, repel, oppose (the plaintiff's plea)." *See* 4 Oxford English Dictionary 377 (J.A. Simpson & E.S.C. Weiner, eds. 2d ed. 1989). To "execute" a law means to "follow out" the law or "carry" it "into effect." *Id.* at 520. WEC paradoxically argues that intervention would allow the Legislature to "execute" (*i.e.*, "carry into effect") the law, WEC.Opp.5, while the Legislature in fact "defends" the law. While WEC asserts that litigation as a general matter is a "core" executive power that the Legislature cannot pursue absent a "specific constitutional role," WEC.Opp.9–14, WEC offers no explanation of how defending the constitutionality of a law is "executing" that same law. Instead, as *Berger* explained, "a State is free to empower multiple officials to defend its sovereign interests in federal court," and "[p]ermitting the participation of lawfully authorized state agents promotes informed [ ]court decisionmaking and avoids the risk of setting aside duly enacted state law based on an incomplete understanding of relevant state interests." 597 U.S. at 192.

WEC asserts that the Legislature lacks a "constitutional . . . interest" in preventing its enactments from being invalidated, *see* WEC.Opp.9–17, but it is difficult to conceive of a circumstance more directly affecting the Legislature's

constitutional interests. When a court enjoins duly enacted state law, the law "cease[s] to be valid" and is effectively nullified. *State ex rel. Reynolds v. Zimmerman*, 126 N.W.2d 551, 554, 565 (Wis. 1964). That squarely implicates the Legislature's "institutional interest" in "whether there shall be a law." *SEIU*, 946 N.W.2d at 56.

WEC's discussion of *Kaul*, 21 N.W.3d 513, does not help it. WEC.Opp.10–17. *Kaul* considered an "as-applied . . . challenge" to the Legislature's exercise of its statutory approval power over proposed settlements in "two categories of civil cases": "civil actions prosecuted by the Attorney General to enforce state laws" and civil actions prosecuted "at the request of 'the head of any department of the state government.'" 21 N.W.3d at 519–21 (citations omitted). The Wisconsin Supreme Court held that, "[w]ithin th[ose] two categories of cases," "the Legislature ha[d] not identified a constitutional interest for itself" justifying its statutory review authority. *Id.* at 527–28. *Kaul* does not aid WEC because it did not address whether the Legislature has an interest in *defending* the constitutionality of its statutes. *See id.* at 521–22. Neither of the case categories that *Kaul* addressed involved those types of challenges, *see id.* at 519–21, and, indeed, **the Attorney General (the plaintiff in *Kaul*) *expressly* disclaimed in *Kaul* any challenge to the Legislature's involvement in plaintiff-side settlements that conceded the unconstitutionality of statutes**. *See* Decl. Of Kevin M. LeRoy ("LeRoy Decl."), June 11, 2026, Ex.A at 31 n.5.

WEC's invocation of *Evers I* is even more puzzling. WEC.Opp.8–9. *Evers I* involved a challenge to what the court found to be a "legislative veto" of executive

action, *see* 8 N.W.3d at 408–10, and has nothing to do with the defense of a duly enacted law against a constitutional challenge in court.

3. WEC also makes a perfunctory argument that the Legislature does not satisfy the interest or adequacy-of-representation elements for mandatory intervention due to the WEC's own defense of Act 126 here. WEC.Opp.20–21. But under *Berger*, the Legislature easily satisfies these elements. Mot.13–14, 18–21. *Berger* concluded that statutorily authorized legislative leaders had an interest in defending a challenged state law, notwithstanding the presence of another authorized state agent. 597 U.S. at 191–95. *Berger* also concluded that even state officials with "closely aligned" interests should not be considered to have "identical" interests, such that the "burden" imposed by the adequacy element "should be treated as minimal" (albeit not eliminated). *Id.* at 196.[2]

A duly authorized state official ordinarily satisfies that minimal burden because the State's choice for its "representatives should be greeted in federal court with respect, not adverse presumptions." *Id.* at 197. Thus, the Legislature has met that minimal burden here under *Berger*.

[2] That is also why Plaintiff's suggestion that the Legislature does not have a "per se right" to intervene under *Berger*, Dkt.24 at 2, misses the mark. Plaintiff's further suggestion that the Legislature is "effectively in control" of members of WEC is risible. *Id.* at 3. While certain legislative leaders play an important role in appointing WEC Commissioners, they have no authority to control WEC's actions after such appointment. For example, the Legislature could not require WEC to make the *Luft* arguments that WEC is unwilling to make in this case, nor could the Legislature require WEC to stop its practice of inexplicably refusing to defend, or dropping its defense of, duly enacted statutes when WEC is sued. *See infra* p.12.

The Seventh Circuit has addressed this issue in closely analogous circumstances. In *Democratic National Committee v. Bostelmann*, 977 F.3d 639 (7th Cir. 2020), the Seventh Circuit was considering an emergency appeal from the Legislature that sought to overturn a preliminary injunction against certain state election laws, and the Seventh Circuit ultimately certified to the Wisconsin Supreme Court the question of whether the Legislature had the authority to speak on behalf of the State in defense of state law, in a case where WEC was the named defendant. The Wisconsin Supreme Court answered the question in *Democratic National Committee v. Bostelmann*, 949 N.W.2d 423 (Wis. 2020), holding that Section 803.09(2m) "unmistakably grants the Legislature an interest in defending the validity of state law when challenged in court," without anywhere conditioning that authoritative interpretation on the *absence* of an executive-branch official also defending the law. *Id.* at 426. The Seventh Circuit then honored that decision in full by allowing the Legislature to appear on behalf of the State in federal court. 977 F.3d at 641. WEC attempts to ignore this history by citing the *dissent* in *Bostelmann*, WEC.Opp.19–20, but a "dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).

Even if this Court concluded that a more searching lack-of-adequacy inquiry were required, the Legislature still satisfies this element. As in *Liebert*, 345 F.R.D. 169, the Legislature intends to pursue meritorious arguments in support of a state statute that WEC has chosen not to present—namely, its argument based on *Luft*.

Mot.19–20. WEC misrepresents the Legislature as merely criticizing WEC for failing to cite *Luft*. WEC.Opp.21. But the Legislature's position is that *Luft* fundamentally changes the applicable *Anderson/Burdick* framework and makes Plaintiff's burden heavier (indeed, impossible) to carry. Mot.19–20. WEC, for its part, just rests on the *Anderson/Burdick* standard, pre-*Luft*. Dkt.14 at 10–11, 19–20. Additionally, as the Legislature explained, WEC's erratic history of defending Wisconsin law, including through appeal, also establishes the inadequacy of its representation here. Mot.20–21. Remarkably, WEC offers no explanation at all for why it only sometimes chooses not to defend the election laws based upon the assertion that its role is to solely administer (not defend) such laws, *see, e.g.*, LeRoy Decl. Exs.B–C, but otherwise does defend other election laws in materially indistinguishable circumstances. All WEC can muster is the assertion that this "say[s] nothing about an adequate defense at the case at hand," WEC.Opp.21, but that is just a tacit admission that even WEC cannot reconcile its position as to when it will and will not defend state election laws.

## II. The Court Should Grant The Legislature Permissive Intervention Under Rule 24(b)(1)(B), Like The Court In *Liebert*, Which Would Avoid The Constitutional Issues That WEC Raises

A. This Court can also grant permissive intervention under Rule 24(b)(1)(B). The Legislature meets all factors for permissive intervention. Mot.22–24; Fed. R. Civ. P. 24(b)(1). The Legislature's Motion is timely, and its proposed Answer asserts defenses that share common questions of law with the main action. Fed. R. Civ. P. 24(b)(1); *see* Dkt.19. In exercising its "wholly discretionary" authority, the Court may consider federal-state comity and the State's choice of who will "defend its sovereign interests in federal court." *Berger*, 597 U.S. at 192–93 (citation omitted); *see Liebert*,

345 F.R.D. at 172. The Legislature's participation is essential to provide full adversarial briefing. Mot.11–24. Nor would permissive intervention pose practical difficulties, because as *Berger* explained, "federal courts routinely handle cases involving multiple officials sometimes represented by different attorneys taking different positions" and "[w]hatever additional burdens adding the legislative leaders to this case may pose, those burdens [will] fall well within the bounds of everyday case management." *Id.* at 199–200 (citations omitted). And none of the existing parties "will be unfairly prejudiced by the legislature's presence" because the Legislature sought to intervene at the earliest stages, disclosed its intent in its May 8, 2026 letter, and will "cooperate with the existing parties and abide by [any] scheduling order." *Liebert*, 345 F.R.D. at 172; *see* Dkt.13.

B. WEC opposes the Legislature's request for permissive intervention on two grounds. First, that the Legislature appearing even via permissive intervention in this federal case to defend state law would violate the Wisconsin Constitution, which, somehow, precludes this Court from permitting the Legislature to intervene. WEC.Opp.4–5. Second, that the Legislature's presence here would allegedly complicate and delay this case. WEC.Opp.22–23. Both arguments are wrong.

*First*, while WEC argues that even the Legislature's permissive intervention violates the Wisconsin Constitution, WEC.Opp.4–5, this Court granting the Legislature permissive intervention under Rule 24(b) renders this argument irrelevant. This Court granting the Legislature permissive intervention has nothing to do with the Wisconsin Constitution because the authority under which this Court

would be acting is grounded in Rule 24, the Rules Enabling Act, 28 U.S.C. §§ 2071–77, and Article III of the U.S. Constitution. Federal courts have wide discretion to grant permissive intervention upon a showing that a party has a "claim or defense that shares with the main action a common question of law or fact" and "timely" intervened. Rule 24(b); *see Liebert*, 345 F.R.D. at 171. Thus, even if Wisconsin courts were to hold that the Wisconsin Constitution limits Wisconsin courts' authority to grant permissive intervention to the Legislature (itself a meritless position[3]) that would not impact this Court's federal authority, including in light of the U.S. Constitution's Supremacy Clause. U.S. Const. art. VI.

Judge Peterson addressed the same situation in *Liebert*. There, the Legislature moved to intervene permissively and as a matter of right. *Liebert*, 345 F.R.D. at 171. WEC opposed, including by arguing that Section 803.09(2m) violated the Wisconsin Constitution. *Id.* at 171–72. *Liebert* granted permissive intervention to the Legislature, given that "[i]t makes sense to allow the legislature to participate in the litigation in light of the significant differences between the legislature's and other defendants' arguments," while appropriately declining to address at all the Attorney General's state-constitutional arguments, given their irrelevance to the federal permissive-intervention analysis. *Id.* In its Opposition here, WEC attempts

[3] In fact, Wisconsin courts have wide discretion under the Wisconsin Constitution to permit parties to intervene because they have the "duty to say what the law is," *Tetra Tech EC, Inc. v. Wis. Dep't of Revenue*, 914 N.W.2d 21, 45 (Wis. 2018) (citation omitted), and permissive intervention is part of a court's exercise of that responsibility, allowing it to decide the case by "involving as many apparently concerned persons as is compatible with efficiency and due process," *Bilder v. Delavan Twp.*, 334 N.W.2d 252, 547 (Wis. 1983) (citation omitted).

to distinguish *Liebert* in a single footnote, stating only that *Liebert* was decided before *Evers I* and *Kaul* and so it "did not decide whether intervention would violate Wisconsin's separation of powers." WEC.Opp.14 n.5. While *Evers I* and *Kaul* do not support WEC's argument that Section 803.09(2m) violates the Wisconsin Constitution, *supra* pp.7–10, this claim is irrelevant for permissive intervention, as explained immediately above, *see supra* pp.13–14.

*Second*, WEC makes only a brief argument that granting the Legislature permissive intervention would "complicate and delay this case," WEC.Opp.22, but this too is wrong. As *Berger* explained, "federal courts routinely handle cases involving multiple officials sometimes represented by different attorneys taking different positions," and "[w]hatever additional burdens adding the legislative leaders to [a] case may pose, those burdens fall well within the bounds of everyday case management." 597 U.S. at 199–200. WEC's Opposition ignores this directly on-point instruction from *Berger* and identifies no historical example in which the Legislature's frequent participation as an intervenor in defense of state law has "complicat[ed] [or] delay[ed]" any case. *See, e.g.*, WEC.Opp.3 ("Legislature [has] intervened in a multitude of cases, particularly election-related cases"). Consistent with *Berger*, and just like in *Liebert*, permitting the Legislature to intervene will not delay or complicate this case.

## CONCLUSION

This Court should grant the Legislature's Motion to Intervene.

Dated: June 11, 2026.

Respectfully submitted,

/s/ *Misha Tseytlin*
MISHA TSEYTLIN
*Counsel of Record*
(State Bar No. 1102199)
KEVIN M. LEROY
(State Bar No. 1105053)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Counsel for the Wisconsin State Legislature*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of June, 2026, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

*/s/ Misha Tseytlin*
MISHA TSEYTLIN
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com

## CIRCUIT RULE 30(d) CERTIFICATE

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rules 30(a) and (b) are included in the Required Short Appendix bound with the Wisconsin State Legislature's Principal Brief or the Separate Appendix filed concurrently.

Dated: September 9, 2026

/s/ *Misha Tseytlin*
MISHA TSEYTLIN

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2026, I filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: September 9, 2026

/s/ *Misha Tseytlin*
MISHA TSEYTLIN